IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

T-MOBILE CENTRAL, LLC, as
Successor in interest to VOICESTREAM
KANSAS CITY, INC. d/b/a T-MOBILE

        Plaintiff,

v.                                  Case No. 06-2313-DJW

UNIFIED GOVERNMENT OF
WYANDOTTE COUNTY/KANSAS
CITY, KANSAS

        Defendant.

## MEMORANDUM AND ORDER

## I.    INTRODUCTION

This is an action for declaratory, injunctive, and mandamus relief pursuant to the Federal Telecommunications Act of 1996 (the "TCA").[1] More specifically, T-Mobile alleges that the Defendant's denial of Plaintiff's application for Special Use Permit to construct a wireless telecommunications facility violates the TCA.

Before the Court are cross-motions for summary judgment filed by Plaintiff T-Mobile Central, LLC ("T-Mobile") (doc. 22) and Defendant Unified Government of Wyandotte County/Kansas City, Kansas ("Unified Government") (doc. 28). For the reasons set forth below, the Court will grant T-Mobile's Motion for Summary Judgment and deny the Unified Government's Motion for Summary Judgment.

---

[1] 47 U.S.C. § 332 (1996).

## II.   SYNOPSIS OF MEMORANDUM AND ORDER

The issues presented in this lawsuit are:

(1)     whether the Unified Government's denial of T-Mobile's application to construct a wireless communication tower was supported by substantial evidence in the written record as required by the TCA; and

(2)     whether the denial had the effect of prohibiting the provision of personal wireless services in violation of the TCA.

Although, at first glance, the issues presented above seem narrow and straightforward, there are a considerable number of uncontroverted facts in this case and, on several issues of law, no clear precedent in the Tenth Circuit.  In light of these circumstances, the Court finds it helpful to begin this opinion with a brief synopsis.

After setting forth the legal standard for summary judgment (Section III) and the uncontroverted facts (Section IV), the Court will begin its analysis (Section V) by discussing the first issue raised in this lawsuit: whether denial of T-Mobile's application is supported by substantial evidence (Section V(A)).  Judicial review under the substantial evidence standard, even at the summary judgment stage, is quite narrow and highly deferential to the local decision-making entity.[2] The court is limited to reviewing only the administrative record to see if it contains substantial evidence to support the local board's decision.[3]  To that end, the Court will discuss the appropriate "substantial evidence" legal standard (Section V(A)(1)) and then will review the local zoning ordinances relied upon by the Unified Government in denying the application (Section V(A)(2)). Applying the facts to the law, the Court will then go through each of the Unified Government's

[2]*Second Generation Props., L.P. v. Town of Pelham*, 313 F.3d 620, 627-28 (1st Cir. 2002).

[3]*Id.*

2

reasons for denying T-Mobile's application  in order to determine whether each is supported by substantial evidence (Section V(A)(3)).[4]

The Court will continue its analysis in Section V by discussing the second issue raised in this lawsuit:  whether denial of T-Mobile's Application had the effect of prohibiting the provision of personal wireless services in violation of the TCA (Section V(B)).  Unlike a substantial evidence claim, the parties readily acknowledge that an effective prohibition claim is reviewed *de novo* and may be based on newly proffered evidence.[5]  To that end, the Court first will discuss the appropriate legal standard of review (Section V(B)(1)(a)) and then determine the meaning of the terms "prohibition" and "service gap" as used in the TCA (Section V(B)(1)(b)).  Because review is *de novo*, the Court next will set forth the evidence presented by each of the parties (Section V(B)(2)). Finally, the Court will apply the facts to the law to determine whether denial of T-Mobile's Application had the effect of prohibiting the provision of personal wireless services in violation of the TCA (Section V(B)(2)).

---

[4]Although the Unified Government provides three primary reasons for the denial, each of the primary reasons includes at least three additional secondary reasons to support denial.

[5]T-Mobile's Memorandum in Support of Summary Judgment (doc. 23), Section IV(A) at p.50 (citing *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 833 (7th Cir. 2003); The Unified Government's Memorandum in Support of Summary Judgment (doc. 29), Section II(A) at p.27 (citing *Second Generation*, 313 F.3d at 629 (citing authority)).

### III.    **SUMMARY JUDGMENT STANDARD**[6]

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law."[7]  In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[8]  A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[9]  An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[10]

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law.[11]  In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim.[12]

---

[6]T-Mobile and the Unified Government both have filed motions for summary judgment. The court will address the motions together. The legal standard does not change if the parties file cross-motions for summary judgment. Each party has the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law. *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[7]Fed. R. Civ. P. 56(c).

[8]*Spaulding v. United Transp. Union,* 279 F.3d 901, 904 (10th Cir. 2002).

[9]*Wright ex rel. Trust Co. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231-32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[10]*Adler*, 144 F.3d at 670 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[11]*Spaulding*, 279 F.3d at 904 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[12]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[13] The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[14] Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[15] To accomplish this, the facts "must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein."[16] Finally, the court notes that summary judgment is not a "disfavored procedural shortcut"; rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"[17]

## IV.   UNCONTROVERTED FACTS

### A.   The Parties

T-Mobile is in the telecommunications business and provides commercial mobile radio telecommunications services ("personal wireless service") as that term is defined by the Federal Communications Commission ("FCC").[18] The Unified Government is the consolidated government of Wyandotte County and the City of Kansas City, Kansas.

---

[13]*Spaulding*, 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)); *see also Anderson*, 477 U.S. at 256; *Celotex*, 477 U.S. at 324.

[14]*Anderson*, 477 U.S. at 256; *Eck v. Parke, Davis & Co.*, 256 F.3d 1013, 1017 (10th Cir. 2001).

[15]*Mitchell v. City of Moore,* 218 F.3d 1190, 1197-98 (10th Cir. 2000) (citation omitted).

[16]*Adams*, 233 F.3d at 1246.

[17]*Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[18]47 C.F.R. § 20.3 (1996).

## B.     Wireless Communication Facilities in General

Wireless communications systems rely on an overlapping and interconnected network of antenna facilities known as wireless communications facilities ("WCFs"). WCFs are radio antennas that receive and transmit low-power radio signals to and from mobile wireless handsets, thereby facilitating wireless or "mobile" communications.  The antennas of WCFs must be located on structures of sufficient height, such as communication towers, to transmit and receive radio signals over large distances. Where no such structures exist, new communication towers may be needed. Any tower component of a WCF must be located within a limited area so it can provide line-of-sight communications with mobile wireless handsets and to properly interact with other WCFs.  Each telecommunications tower has a limited maximum coverage area, the extent of which varies depending upon several factors, including the tower height, local topography, configuration of various existing structures, and population densities.

## C.     The Lease for the Proposed Site

T-Mobile is the lessee of certain real property located in the vicinity of 2900 Minnesota Avenue in Kansas City, Wyandotte County, Kansas (the "Proposed Site"), and T-Mobile seeks to construct a new WCF on that property.  T-Mobile entered into a Site Lease with Option (the "Lease") for the Proposed Site with First Baptist Church of Kansas City, Kansas (the "Church"). The Proposed Site is a 50-foot by 50-foot tract of land located on the Church's property.  Pursuant to the Lease, the Church grants T-Mobile the right "to erect and maintain on the Premises improvements, personal property and facilities necessary to operate its communications system, including, without limitation, radio transmitting and receiving antennas, microwave dishes, tower and base, equipment shelters and/or cabinets and related cables and utility lines and a location based system."

**D.      Kansas City, Kansas Code of Ordinances**

Kansas City, Kansas Code of Ordinances ("Code") section 27-260 provides that decisions and recommendations of acting bodies should take into consideration: "(1) Conformance with regulations, the comprehensive plan, and other adopted plans, design guidelines and policies; (2) Recommendations of staff and recommending bodies; (3) Input of reviewing agencies and departments; (4) Public comment and testimony received at the hearing; and (5) Effects of the proposal on the neighborhood, area, and community-at-large."

Section 27-1252(a)(32) of the Code permits telecommunications antennas and towers in Kansas City, Kansas, under Special Use Permit.  Section 27-1252(a)(32)(h) states that "[i]n evaluating such proposed sites, commercial districts are generally preferred over those in residential districts as are sites in less restrictive residential or commercial districts generally preferred over those in more restrictive districts (section 27-1049(f))."

Section 27-275(f)(7) of the Code provides for ten separate residential zoning districts in Kansas City, Kansas, classified from "Most Restrictive" to "Least Restrictive."  The property upon which T-Mobile's proposed telecommunications tower is zoned R-1(B) Single Family District.  The R-1(B) Single Family District zone is the third most restrictive residential zoning classification. Section 27-1160(a) states that the purpose of R-1(B) districts is to "provide for new and infill residential development in those older areas of the city where the existing development was substantially completed prior to World War II.." Section 27-1160(c)(1) of the Code generally contemplates that structures in R-1(B) districts will not be over 35 feet tall.

The Kansas City, Kansas Master Plan Land Use map designates general areas for the following categories: (1) Agricultural & Rural Residential; (2) Low Density Residential; (3) Medium

7

Density Residential; (4) Office; (5) Commercial; (6) Light Industrial; (7) Heavy Industrial; (8) Parks,

Public, & Semi-Public Properties; and (9) Special Conditions.  There is no mention of cell towers

on the Kansas City, Kansas Master Plan Land Use map.  The Master Plan Land Use map states:

"This is a generalized plan. Please refer to area plans for specific parcel information."

      **E.**      **T-Mobile's Application for Special Use Permit**

On December 9, 2005, T-Mobile submitted an Application for Special Use Permit (the

"Application") to the Unified Government's Department of Urban Planning and Land Use ("City

Staff"). Included within the Application was a letter from Selective Site Consultants, Inc.[19] to Mr.

Scott Murray, Urban Planner for the Unified Government (the "Application Letter").

As stated in the Application Letter, the purpose of the Application "is to provide adequate

coverage to the residential areas and vehicular traffic in all directions of the [P]roposed [S]ite."  The

Application Letter further states: "This geographic area is an existing coverage gap in T-Mobile's

network, and customers in this area experience a high frequency of 'dropped calls' and 'no signal

found'," which "prevents T-Mobile customers from initiating and carrying calls."  T-Mobile notes

that the only residential properties near the Proposed Site "are located to the southeast of the parent

tract and all view of the tower will be blocked by the church building."

T-Mobile describes the proposed tower as "an 80 foot monopole with 4-10 foot fiberglass

flush mount, unipac antenna array mounted on top of each other for a total structure height of 120

feet" that would "look like a flagpole." T-Mobile submitted a photo simulation of the proposed tower

along with the Application.  T-Mobile notes that the tower "will be surrounded by a six (6) foot

---

[19]Selective Sites Consultants, Inc. is a firm that provides leasing, zoning, and construction
project management services to T-Mobile.

wooden fence including brick columns that is intended to make this compound appear to be a part of the overall church facilities," and the compound "will be surrounded with landscaping of mature vegetation providing a buffer zone to shield the ground portion of the facility visually." T-Mobile also notes that the proposed tower is capable of supporting additional wireless telecommunications carriers if needed.

T-Mobile states in the Application Letter that the proposed tower is only 120 feet in height, and therefore the tower does not need to be illuminated under FCC and FAA rules. T-Mobile further states that once the proposed tower is constructed, the only routine vehicular traffic to the tower will be that of a technician coming to the Proposed Site for about an hour once a month for routine maintenance services. Moreover, the Proposed Site will only use telephone and power services – no water, sewer, waste disposal, or similar public services are required.

Along with the Application Letter, T-Mobile submitted the following exhibits: (1) Vicinity Maps of the area; (2) PIN Sheet relating to Parent Parcel; (3) Plat Maps of the Parent Parcel; (4) Title Report including Deed to Parent Property; (5) Aerial Map of the Parent Parcel and Surrounding Area; and (6) USGS Topographical Map of Parent Parcel and Surrounding Area.

T-Mobile also submitted a site justification map prepared by Selective Site Consultants to capture all of the possible co-location properties within a mile radius of the Proposed Site. The site justification map of the preliminary search area submitted by T-Mobile identified the city-owned water tower and described it as infeasible because it was "Loaded, No Ground Space." The map also identified a Board of Public Utilities ("BPU") water tower and likewise described it as infeasible because it was "Top Occupied."

T-Mobile also submitted a "Tower Manufacturer's Report on the Design and Reliability of

Tapered Monopole Type Towers." In conjunction with this report, T-Mobile submitted the Affidavit of Robert M. Herlihy ("Herlihy"), an employee of Selective Site Consultants, Inc., stating that T-Mobile requires site acquisition personnel to first look for co-location opportunities within a given search area before attempting to find areas where a new tower will be required, and that to fulfill such requirement, he drove the area within a one-mile radius of the Proposed Site "to determine if there were any available structures that would meet the Radio Frequency Engineer's requested antenna height." T-Mobile submitted a map of the search area, or search ring, with Herlihy's affidavit.

The Application Letter explained: "When new tower sites are required, a location is chosen after a 'Search Ring' is developed and issued by T-Mobile's Radio Frequency Engineers. The Search Ring indicates a geographic area in which potential sites may be located [that] will result in the maximum amount of coverage in an impaired service area." Herlihy stated that he looked for structures such as water towers, existing telecommunication towers, and tall buildings that would provide co-location opportunities at the height limitation provided by T-Mobile's Radio Frequency Engineers. Herlihy noted that he found a few water towers to the west of the Proposed Site, but the towers "appear to be full of antennas at the present time and are located too far to the west to be of value in covering the coverage objective of the area in and around the intersection of U.S. Highway 24 and 29th Street." Herlihy also explained:

> There is a stadium light standard monopole on the grounds of Wyandotte High School approximately .50 miles to the southeast of the [P]roposed [S]ite. While this tower appears to be approximately the desired height requested by T-Mobile's Radio Frequency Engineer of 130 feet, there is presently a carrier occupying the top of the tower. Because of vertical separation requirements between antennas of 20 feet, the highest T- Mobile could go on this structure is 110 feet. When you couple this with the fact that the High School tower sits at an elevation seventy feet (70') lower than

that at the [P]roposed [S]ite, the effect is to make this tower ineffective (see differences in coverage patterns shown by propagation comparisons included in this packet).

T-Mobile also submitted the Affidavit of Joe Heikes ("Heikes"), the Director of Engineering and Operations for T-Mobile in the Kansas and Missouri markets, in support of its Application. In his affidavit, Heikes stated that the tower would be surrounded by a wooden fence and landscaped according to Zoning Regulations and that the tower would comply with all FAA and FCC regulations. Heikes submitted a second affidavit in support of the Application stating that the proposed tower would be able to accommodate two other wireless carriers for co-location. With its Application, T-Mobile provided evidence that wireless towers do not have an adverse impact on real property values.

In addition, T-Mobile presented a Radio Frequency Engineer's Propagation and Coverage Report (the "Coverage Report") to document the coverage deficiency in T-Mobile's network. To that end, the Coverage Report concludes there is a "significant lack of 'in-building' coverage near the area of U.S. Hwy. 24 & 29th Street." The Coverage Report also contains a Propagation Prediction map labeled "Existing T-Mobile Coverage."

According to the Coverage Report, T-Mobile has three existing cell-site locations that "provide the areas near I-635 & Chelsea Traffic Way, the areas along and near I-70, and the area near the intersection of [U.S.] Hwy 24 an[d] 10th Street with good in-building coverage for a large number of residential and commercial buildings," but the existing sites "do not provide any in-building coverage to the areas along Hwy 24 between I-635 and 24th Street and stretching south to Kaw/Park Drive."

According to the Coverage Report, the Proposed Site "will provide much of the desired

11

in-building coverage for the area along Hwy 24 between I-635 and 24th Street and stretching south to Kaw/Park Drive." According to the Coverage Report and accompanying Propagation Prediction Study titled "Proposed T-Mobile coverage using the existing monopole at Wyandotte High School," T-Mobile's coverage gap will not be filled if T-Mobile uses the monopole at Wyandotte High School (the "High School Tower").  According to the Coverage Report and accompanying Propagation Prediction Study titled "Proposed T-Mobile Coverage at the First Baptist Church Location," a 120-foot tower at the Proposed Site will remedy the coverage gap.

### F.    The March 13 City Staff Report

City Staff prepared a report, dated March 13, 2006, for the City Planning Commission regarding T-Mobile's Application (the "March 13 City Staff Report").  This March 13 City Staff Report noted that the Proposed Site is currently zoned R-1(B) Single Family District, and the Master Plan Designation is "Commercial."   The March 13 City Staff Report also acknowledged the following:

- The property is currently used as a church.

- The existing surrounding zoning is C-3 commercial to the north, RP-5 planned apartment to the south, and C-3 commercial and R-1(B) single family to the east and west; and

- The existing uses of the property surrounding the Proposed Site are O'Reilly's Auto Parts to the north, seminary buildings to the south, single family residential to the east, and the Church to the west.

### G.    Factors Considered by City Staff in the March 13 City Staff Report

The March 13 City Staff Report contains an analysis prepared by City Staff evaluating how the Application meets the criteria, or factors, for considering Special Use Permits.  This section of the report is entitled "Factors To Be Considered" and discusses the following thirteen factors:

12

City Staff considered the "character of the neighborhood" (the "First Factor") and stated: "The neighborhood is somewhat commercial in nature. There are few residential uses in the general area including some seminary residential uses."

City Staff considered the "zoning and uses of properties nearby and the proposed uses expected compatibility with them" (the "Second Factor") and stated: "The tower will be the tallest structure in the area and highly visible from all directions due to the relatively flat terrain in the vicinity."

City Staff considered the "suitability of the property for the uses to which it has been restricted" and whether "removal of the restrictions detrimentally affect nearby property" (the "Third and Fourth Factors") and stated: "It is probable that a tower may be considered unsightly by many."

City Staff considered the "length of time the property has remained vacant as zoned" (the "Fifth Factor") and stated: "The property is occupied by a church and related buildings."

City Staff considered the "degree of conformance of the proposed use to the Master Plan" (the "Sixth Factor") and stated: "The Master Plan does not designate areas for cell towers. The church is in compliance."

City Staff considered the "relative gain to the public health, safety, and welfare as compared to the hardship imposed on the individual landowner or landowners" (the "Seventh Factor") and stated: "The relative gain to the general public is difficult to determine. Unclear data was supplied to indicate that there is an actual deficiency in the performance of existing cellular coverage."

City Staff considered "whether the proposed use is reasonably necessary for the convenience and welfare of the public and will not substantially or permanently injure the appropriate use, visual quality, or marketability of adjoining property" (the "Eighth Factor") and stated:

13

This aspect of the application is difficult to prove by staff. Several requests for highly detailed information have been returned with incomplete or numbers that were difficult to quantify thoroughly. Unfortunately, the applicant refused to submit dropped call maps indicating a problem in the area this cell tower will cover. Thus, no accurate determination of need or necessity can be formulated at this time. Similar information was requested and received from other recent applications.

City Staff considered "whether the proposed use will result in increasing the amount of vehicular traffic to the point where it exceeds the capacity of the street network to accommodate it" (the "Ninth Factor") and stated: "No traffic impact will be realized."

City Staff considered "whether the noise, vibration, dust, or illumination that would normally be associated with such use if of such duration and intensity as to create problems for near-by property" (the "Tenth Factor") and stated: "Not an issue."

City Staff considered "whether the proposed use will pollute the air, land or water" (the "Eleventh Factor") and stated: "Not an issue."

City Staff considered "whether the use would damage or destroy an irreplaceable natural resource" (the "Twelfth Factor") and stated: "Not an issue."

Finally, City Staff considered "whether the proposed use would result in overcrowding of land or cause undue concentrations of population" (the "Thirteenth Factor") and stated: "Not an issue."

As noted in the March 13 City Staff Report, there was no public opposition to the Application as of the date of the report.

## H.    City Staff Noted "Key Issues" in the March 13 City Staff Report

City Staff considered three "key issues" in its March 13 City Staff Report – location, data, and colors.  As to location, City Staff noted: "The structure of the antenna appears to be properly

located. The tower's required distances away from other properties and residential structures have been met." As to data, City Staff commented: "Information regarding the type of coverage needed was supplied and is clear. However, insufficient data regarding 'dropped' calls was provided. Therefore, staff has serious concerns about the need for this tower in this general location. Without information regarding a clearly presented deficiency in performance staff will have difficulty endorsing this application." As to color, City Staff indicated: "Staff would like to see a color or materials board for the tower enclosure."

I.      **City Staff Review of Ordinance Requirements in March 13 City Staff Report**

City Staff evaluated the proposed WCF's compliance with Code requirements in a section of the March 13 City Staff Report labeled "Regarding City Code's Requirements." This section acknowledges that the following requirements have been met:

- As a tower more than 100 feet tall, it is designed to accommodate at least three communication carriers;

- The tower is located a distance from the off-site main residential structure at least equal to twice the height of the tower;

- The tower is not located within a distance of one-third of the height of the tower from any land without the landowner's written consent; and

- The tower is not located within a distance equal to the height of the tower from any off-site main residential structure.

The Code also requires landscaping of the tower site to be in accordance with 27-1349(a)(5). With regard to this requirement, the March 13 City Staff Report notes that the "[l]andscaping needs to be more fully detailed."

J.      **City Staff comments and suggestions in the March 13 City Staff Report**

City Staff reported that in response to its request for information regarding dropped calls for

15

"in-commercial buildings" in the vicinity, T-Mobile supplied the following information from the

week of February 23, 2006 through March 1, 2006:

> [The] area has 1,812 drops in that week with 445+K call attempts and nearly 8.5K hours of traffic. The information equates to nearly 280 minutes of use per drop for our customers.
>
> Looking at the Kansas sites within the metro core we averaged for that week a minute of use per drop for our customers of nearly 310 (5+ hours between drops on average). In this area there were nearly 53K drops with 1.6+ million call attempts and 270K hours of traffic.
>
> Loaded with this information it can be stated that the area . . . needs to improve by an hour and a half per drop just to be average in the area. So a site in this area will help T-Mobile get that extra 90 minutes between drops. Along with this thinking the area . . . would need to improve by a half an hour per drop again to be average for the network. So a site in this area will help get that extra 30 minutes between drops for our customers."

With regard to this information, City Staff commented: "Staff understands the potential need

for an additional tower in this location, however, information regarding dropped calls and the sincere

need for a tower have not been fully divulged. Staff would like to see where, when and the number

of dropped calls prior to recommending approval." City Staff ultimately recommended that "the City

Planning Commission make the findings contained within the City Staff Report related to Factors

to be Considered, and Key Issues and recommend DENIAL" of T-Mobile's Application "subject to

all comments and suggestions outlined in this City Staff Report." At least one of the reasons City

Staff based its recommended denial of the Application was that it did not believe T-Mobile's gap

in service coverage was serious enough to warrant a new WCF.

### K.     The March 13 Planning Commission Public Hearing

The Unified Government Planning Commission (the "Planning Commission") first

considered T-Mobile's Application at a duly noticed public hearing on March 13, 2006 (the

16

"March 13 Planning Commission hearing").  T-Mobile presented a site plan of the Proposed Site at the March 13 Planning Commission hearing.  T-Mobile also presented radio frequency propagation maps at the March 13 hearing.  Five people appeared at the March 13 Planning Commission hearing in support of T-Mobile's Application, and no one appeared in opposition.

At the March 13 Planning Commission hearing, Vice-Chairman Davis asked if there is another site that T-Mobile could co-locate on, and T-Mobile's representative, Herlihy, explained:

> [T-Mobile] looked at the high school to the southeast and they did a propagation study and there were deficiencies that they could not [co-]locate on the light standard. [T-Mobile] looked at a couple of water towers to the west and they seemed to have antenna on the top of them and it would indicate that they [T-Mobile] would be lower on the tower.

Davis also asked Herlihy if T-Mobile talked to the Board of Public Utilities ("BPU") to, first, determine whether there was space available and, if so, whether T-Mobile did a propagation study. Herlihy explained that T-Mobile has "dealt with BPU and when a site is available that meets their search area criteria or is close enough to be used for what they are trying to cover they do use that. But in this case, that was not acceptable; it was too far out of the search ring in order to be an acceptable site."

According to the minutes of the March 13 Planning Commission hearing, Planning Director Richardson stated:

> that the staff was provided propagation maps and the staff requested to see dropped call data on the maps. The Commission has seen propagation maps before and they are difficult to understand and that is why the staff asked for dropped call data and maps. [T-Mobile] provided dropped call data for an area and that area was not defined in the documentation received as far as the boundary. That is where the confusion was. If [T-Mobile] can supply the data requested, this case and the following case can be continued until next month and they can provide the data.

17

Planning Commissioner Walden stated that he did not think T-Mobile would spend the money to build a tower at the Proposed Site if T-Mobile did not think that it needed it, and that because all of the Code requirements have been met, he did not understand why City Staff is requesting additional dropped call data. In response to Commissioner Walden's comments, Planning Director Richardson stated: "[i]t may be less expensive for [T-Mobile] to build here than locating somewhere else."  At the end of the March 13 Planning Commission hearing, Planning Director Richardson stated that if T-Mobile can supply information supporting the need for the site, then the Planning Staff's concerns could potentially be eliminated. The Planning Commission scheduled the Application for reconsideration on April 10, 2006.

**L.      T-Mobile's Supplemental Coverage Report**

T-Mobile provided City Staff with a second Propagation Studies and Coverage Report ("Supplemental Coverage Report") for the Proposed Site dated March 30, 2006. The Supplemental Coverage Report explained:

> Radio propagation prediction studies are computer simulations of the expected coverage from existing and proposed cell-site facilities. These studies take into account to some degree or other most of the variables that affect the radio coverage of a site. Some of these variables are transmit power, type of antennas, orientation of antennas, above ground height of the antennas, intervening terrain, and local clutter around the mobile station (phone). The computer then calculates an "on-street" signal level that it predicts will be seen by a mobile phone. Then it may be surmised from these predicted signal levels if the resultant coverage will be adequate for the mobile user in a variety of circumstances such as in vehicle or inside a building.
>
> The drive-test study, by contrast, is an actual measurement of the coverage of the network. This test is done by driving in a car in and around the area of interest with a phone which is hooked up to a GPS. In this way it is possible to determine the actual "on-street" coverage level of the network at all of the locations where the car drives. This test can be useful for comparison to the propagation prediction study, and can therefore validate that there are areas, such as part of Kansas City, KS where T-Mobile has a significant gap in coverage.

The Supplemental Coverage Report included a propagation prediction study that states T-Mobile's coverage objectives will not be met if T-Mobile uses the High School Tower, as well as a propagation map showing T-Mobile's existing level of coverage in the area.  The Supplemental Coverage Report also explained the results of the drive test as follows:

> The drive test results, which follow, experimentally confirm the propagation prediction analysis that demonstrated a significant gap in coverage in the T-Mobile network. The signal levels measured in this drive test were "on-street" equivalents and as such they may be compared in an apples-to-apples fashion with the data from the propagation predictions which also depict "on-street" levels.

> These drive test results are generally confirmatory of the propagation prediction studies, even though they reveal the propagation predictions to be at some places optimistic and at others pessimistic. The significant gap in coverage revealed by the propagation study is clearly confirmed in the drive test results. For the most part, the drive test results proved to match the computer generated predictions.

> The drive test shows that in-vehicle [coverage] in the area of concern is marginal and replicates that shown by the propagation studies in this report. Because a house has more loss than a vehicle with a lot of windows, it can be concluded that if the caller is in a house, they would experience even worse coverage than is displayed in the drive test results.

## M.     City Staff's Updated City Staff Report

City Staff prepared an updated City Staff Report for the Planning Commission, dated April 10, 2006 (the "April 10 Updated City Staff Report"), which indicated that there was still no public opposition to the Application.  City Staff considered the same factors as they did in the March 13 City Staff Report, and the City Staff's responses to the Factors 1-6 and 9-13 did not change.

City Staff did change its response to the Seventh Factor to state: "The relative gain to the general public is difficult to determine. Unclear data was supplied to indicate that there is an actually deficiency in the performance of existing cellular coverage. The drive study seems to indicate adequate performance."

19

City Staff also changed its response to the Eighth Factor to state:

> Drive studies indicated no dropped calls in the area surveyed, in stark contrast to the other information previously provided. That study indicates that the drive study is a validation of the propagation study. This test indicated no dropped calls. The Planning Commission has used dropped calls as a measure of service previously. Indicating zero or limited dropped calls seems to indicate this tower is not necessary for the convenience of the public. Perhaps collocation [sic] on another tower in the area would better serve the public in this case.

As to the key issues – location, data, and colors – the only response that changed from the March 13 City Staff Report was that relating to data, for which City Staff noted that "drive test data indicate zero dropped calls." With regard to City Code Requirements, City Staff did not change its position from the March 13 City Staff Report.

### N.     The April 10 Planning Commission Public Hearing

On April 10, 2006, the City Planning Commission met and considered the Application (the "April 10 Planning Commission hearing"). Again, no one appeared in opposition to the Application. T-Mobile's representative, Herlihy, explained that T-Mobile, at City Staff's request,

> performed a drive test. It was done during a weekday, during the day, because of the way that these are done and as a safety precaution[] for the person doing them, they were not done during high-peak driving times, such as rush hour or during weekends. It was also, both of these were done in March when there are no leaves on any of the trees. Foliage alone can reduce a cell-coverage strength of their signal by 50 percent. So, in effect, what you can see by this drive test is basically 50% worse during the summer months and at spring, fall and – summer/fall months than what you see.

Herlihy also stated that "[d]ropped calls mean that there is no signal. We have never professed to say that in these areas there are no signals. What we do profess to say is that the signals where they occur are not sufficient to supply the cell phones with the minimal expectation of coverage that our clients have become accustomed to."

Herlihy further stated that T-Mobile will "buil[d] the site if their [radio frequency] engineers

indicate that it is necessary to increase the signal strength to give their customers that expectation of coverage that they have become accustomed to."

T-Mobile's engineer then explained the propagation maps as follows:

The white areas [on the maps] are areas where you can only receive signals outdoors, you can typically not receive them in your house or place of business or even typically in your vehicle. The light green areas [on the maps] are where you typically receive the signals in your vehicle, but not inside the building. And the darker shaded green is where you receive them inside of a building.

These are the drive-test results, it is the same as what you have on the board there. The blue on this drawing . . . are areas where we wanted to show you where we drove at. However, if you were to compare it to the areas on the other map it would be white. . . So as you can see there is a lot of this area that has no in-building coverage at all. And just because we didn't drop a call in this area while we were driving around, doesn't mean we wouldn't drop a call if you walk inside their houses over there. We don't do that during driving tests, we don't drive into houses.

And our data shows that we have about 300 dropped calls in this area in a day, we have about 300 customers in this area, as well, that would like to have cell phone coverage in their houses.

T-Mobile's engineer also explained that the computer propagation tool uses "terrain, as well as ground cover such as houses, trees and the hills and valleys, water, to detect what it can be."

Planning Director Richardson expressed concern about the number of towers that T-Mobile will request and asked if there are other locations that small towers could be located that would give better service, but he then stated that he is not sure that he is supportive of additional smaller towers. Richardson also stated he had received a map from Cingular on one of that company's applications, and that map pinpointed dropped call locations. Planning Director Richardson also commented:

The tower is very tall, it is in a very unsightly position and we recommend denial of the case, because using the similar analysis that we have used before, it appears that they already have service in the area, whether or not it is in-building or in-car, there is general cell phone coverage in the area.

Vice-Chairman Davis asked Planning Director Richardson: " I don't know if you know the answer to this, Rob, without doing more research, but do you know if this coverage equals or approximately [sic] what the other carriers that have – and if it is in a site that covered the same area, do you know first of all?"  Planning Director Richardson responded: "Well, the most recent one we asked for studies on was this one right here off of County Line Road [the Cingular application].  This is the data [Cingular's dropped-call data] that we have on this site."

Planning Commissioner Walker asked if "the reason for recommending denial is because the staff feels that this solution will not solve the dropped calls issue," to which Planning Director Richardson responded:

> It will in some areas, but it obviously doesn't solve their problem. And, I mean, how many more towers are we going to get to solve their problems here? I think that we can ask them to show us what they need in this area to provide the coverage [t]hat they want and whether it is in-car, whatever they need. But they ought to be showing that to us, at least area-wide, if not, what they are going to plan to do in the city.
>
> I mean this is – are we going to get another 100 towers out of T-Mobile? I mean this is just one at a time, and their strategy is – doesn't seem to be appropriate for use to look at how the city is covered with one use or multiple users. There is an open tower at Wyandotte High School that solves some of this problem, not all of it, and they are not collocating [sic] there.

Planning Commissioner Walker immediately asked Planning Director Richardson if T-Mobile could co-locate at the High School Tower, and he responded "Correct." At the conclusion of the April 10 Planning Commission hearing, the Planning Commission unanimously recommended denial of the Application.

**O.      April 27, 2006 Planning & Zoning Session**

T-Mobile's Application was forwarded to the Board of Commissioners for final consideration.  On April 27, 2006, the Board of Commissioners agreed to continue the Application

to May 25, 2006. No residents appeared in opposition to the Application at the April 27, 2006 session.

P.     City Staff's *Second* Updated City Staff Report

In further support of its Application, T-Mobile submitted the Affidavit of Russell Pope, dated May 19, 2006. City Staff provided an updated City Staff Report to the Board of Commissioners dated May 25, 2006 (the "May 25 Updated City Staff Report") addressing T-Mobile's Application, which indicated that there was no public opposition to the Application to date – and specifically that no one appeared in opposition at either the March 13, 2006 or April 10, 2006 public hearings.  City Staff considered the same thirteen factors as they considered in the March 13 and April 10 City Staff Reports and City Staff's responses to all factors did not change.   In addition, City Staff's consideration of the key issues and the Application's compliance with City Code Requirements did not change from the April 10 Updated City Staff Report. The May 25 Updated City Staff Report again recommended that the Board of Commissioners deny the Application.

Q.     The May 25, 2006 Board of Commissioners Meeting

Because the Planning Commission recommended denial, the zoning code required two-thirds of the Board of Commissioners' vote to override the Planning Commission's recommendation.  Only eight members of the Board were present. At the beginning of the meeting, T-Mobile requested that evaluation of the Application be held over because three members of the Board were absent. A motion to hold over the Application failed for lack of a second. The Board asked T-Mobile to proceed with its presentation on why the Board of Commissioners should approve the Application.

No one appeared in opposition to the Application at the May 25 Board of Commissioners meeting. During the meeting, Commissioner Pettey stated "one of the criteria that's been used is the

23

number of dropped calls. There significantly are not very many dropped calls in this area. Is that correct?" In response, Planning Director Richardson stated

the standard that we had used in the past was the drive test for dropped calls. Their drive test shows no dropped calls. Their computer system shows dropped calls within that area on a weekly basis but I don't believe that's been pinpointed to the sectors of the cells that would apply to where this would go. I don't know that it's fair to say that there aren't any, but they have not been able to pinpoint where those were.

The T-Mobile representative responded to this by explaining:

I do want to take some exceptions to staff's report. Commissioner Pettey is correct, it does say the information we had provided showed no dropped calls. The confusion at the beginning of this application was we presented radio frequency propagation maps and a drive test data [that] was a field test that confirmed what the propagation maps were telling us. These maps are based on computer models and what we provided later to [Planning Director Richardson] is a drive test, which confirmed in the field what our maps already told us, that we had a hole in coverage in this particular area and we needed to fill that with a new site. I'm not sure if [Planning Director Richardson] is convinced at this point whether or not we do have a significant issue in this area. Absolutely 100% we would not be before this body if we didn't believe we have a significant coverage issue in this area. These facilities cost hundreds of thousands of dollars to put up a site. It's not to our business advantage to waste money by putting up sites that aren't necessary. We do have a significant coverage gap issue in this particular location.

The T-Mobile representative further explained the coverage gap by stating:

We do have a significant coverage issue. [Planning Director Richardson] had focused on dropped calls and these maps don't show you dropped calls and neither does the drive test data that we presented earlier. We had to present that to [Planning Director Richardson] separately in some follow up meetings and we did give [him] some data. We had tested the site on two separate weeks and in each of those tests we had over 1,800 dropped calls in this particular area the last week of February. In the first week of May we ran the test again and we had over 2,700 dropped calls in this area. I mentioned before this is an issue of coverage and an area of issue in capacity. It's not to say that we don't have some coverage in the area, but it is very unreliable and certainly not up to the standards of T-Mobile or [its] customers and what they expect to receive in the terms of service when they're paying for it. We clearly have a coverage gap issue and we have the [radio frequency] engineer if you'd like to ask more questions about that.

Commissioner Mitchell then stated: "You're showing a certain test and [Planning Director Richardson] is asking for a different test, are you familiar with the test [he] is asking for?" And T-Mobile's representative responded:

> We don't have maps that represent dropped call data [which is what Planning Director Richardson is asking for]. We know what [Planning Director Richardson] wants and it's dropped call data. We have since met with [Planning Director Richardson] personally and confidentially and provided him with dropped call data. I've mentioned earlier that we do have testing that shows we have had in two different weeks 1,700 dropped calls and 2,700 dropped calls in a week on this particular location. We do have dropped call data if that is important consideration for you because it really hadn't been in the past. It does buffer what we're telling you.

To this explanation, Planning Director Richardson responded:

> On page five of the City Staff Report, in the fourth paragraph under D155 it says, they have 280 minutes of use per dropped in this area. If I had that much service out of my cell phone, I would think that was pretty good. I don't think anyone in this room gets that kind of service. I don't deny there's some kind of need here, but basically they gave us the dropped call drive test and there weren't any on the drive test and their data shows they get 280 minutes of use in their system per dropped call.

In response, the T-Mobile representative stated:

> What we have provided subsequent to providing this information to [Planning Director Richardson], in private because they don't like handing out their dropped call data, is the dropped call data that shows that we have 1,700 and 2,700 dropped calls in two different weeks. [Planning Director Richardson's] point that [280 minutes] without a dropped call is good, isn't good in the industry. The industry averages 310 minutes without a dropped call and we're well below that. . . . Our competitors are going to walk all over us in Wyandotte County if we provide that kind of service to our customers.

At the May 25 Board of Commissioners meeting, T-Mobile addressed the possibility of co-location at the High School Tower and, using radio frequency propagation maps, explained:

> We did analyze this site at Wyandotte High School. That's a Cingular site, but again it's too far outside the [search ring]. The elevation difference between Wyandotte High School and our site here at First Baptist is 40 [feet]. There is a 40 [foot] drop in elevation, which makes a significant difference in terms of what we can cover.

T-Mobile addressed the design of the tower by stating:

> We have tried to minimize the impact of this particular site with the structure itself. The structure itself is called a stealth monopole. It is a single pole and will not have a triangular platform on the top with antennas hanging off. The antennas are going to be housed in containers on top of the tower. There will not be anything sticking out or away from the tower. When we first made this application, we wanted it to be 150 feet tall, which would still be better for us. Because of some of the resistance we've gotten from staff, [we] lowered this height to the bare minimum that we could be at, which is 120 feet. We are proposing a 120 foot tall monopole. . . .We showed our design to the church and everybody felt it was a good use for this site at this church.

As to the nature of the surrounding area, T-Mobile stated:

> [T]he surrounding zoning for the property is C-3. This isn't like this is surrounded by residential areas. If you'd look at the aerial map, the red arrow is highlighting where the pole will be located on the property. The [Church] is located below the red arrow and where the ta[il] of the arrow is touching, the white building immediately to the north is an O'Reilly Auto Parts store. The church to the west is called the Faith Deliverance Family Worship and we have had no issues with the church being there or them complaining about the proposal. We have a seminary associated with the [Church]. There's a park and a youth center to the north. The only residential in this area that is nearby is the area to the south and east of the site . . .. Due to the relationship of where those houses are, that church structure is going to block a significant portion of this monopole structure. They're not really going to be able to see the pole and apparently they don't have a concern for it because all of these people were notified of this hearing and the neighborhood meeting and no one showed up. . . We don't have anyone opposing this site, we have surrounding zoning that's C-3 Commercial.

The Board of Commissioners ultimately voted 7-1 to deny the Application, and the Board of Commissioners instructed City Staff to prepare a detailed written statement of denial.

**R.     The Board of Commissioners' Written Denial of the Application**

In a document titled "Written Denial of Special Use Permit Petition #SP-2005-45" (the "Written Denial"), the Board gave the following reasons for denial of the Application:

1.     Petitioner failed to show that denial of the Special Use Permit will prohibit the provision of personal wireless services.

    a.     Drive studies indicated that there were no dropped calls in the area surveyed in stark contrast to studies submitted for other applications for cellular towers. Indicating zero or limited dropped calls seems to indicate this tower is not necessary for the convenience of the public.

    b.     Petitioner presented no evidence of any gap in service by other providers of personal wireless service.

    c.     The Commission takes judicial notice that its ordinances allows telecommunications towers by right in any M-2 or M-3 Industrial Zones and allows towers by Special Use Permit in all commercial, residential and agricultural zones. Antennas and their support structure are allowed as secondary uses in all zones on any legally established structure over 50 feet tall, including towers, buildings, water towers, light poles, and signs. Subject to a maximum height of 75 feet, telecommunication towers are allowed as accessory to public and semi-public uses.

    d.     Petitioner did not submit any service propagation study plans for a study which contemplates a greater number of shorter "stealth" towers or co-location on existing towers or buildings.

2.     This particular 120 foot tower is not the least intrusive means of fulfilling a gap, if any exists, in the particular service provided by T-Mobile.

    a.     The Unified Government's Ordinance providing for Special Use Permits for telecommunications towers, Sec. 27-1252(32), creates a preference for commercial districts over residential.

    b.     The property for which the Petition was filed is zoned R-1(B) Single Family, one of the most restrictive zoning classifications. The property is currently used for church purposes and the proposed cell tower is a new additional use which has no direct relation with the current use of the property although it would provide additional income to the church.

27

c.   The immediate neighborhood includes mixed residential, institutional and commercial uses typical of the land adjacent to Minnesota and State Avenue between 18th Street and 36th Street. The areas to the North and South of the Avenues are primarily residential. A 120 foot tower is not aesthetically attractive in a residential neighborhood and would create blight in the views of the surrounding residential properties. This tower will be the tallest structure in the area and highly visible from all directions due to the relatively flat terrain.

3.   The Commission has considered the "*Golden*" factors set forth in the City Staff Report and for the reasons stated herein denies Special Use Permit #SP-2005-45.

At the June 29, 2006 meeting, the Board of Commissioners voted to adopt the Written Denial prepared and provided by the City Staff.  The Board of Commissioners' June 29, 2006 adoption of the Written Denial constituted "final action" under 47 U.S.C. § 332(c)(7)(B)(v).

## V.   <u>ANALYSIS</u>

Congress enacted the TCA to promote competition and higher quality in telecommunications services and to encourage the rapid deployment of new telecommunications technologies.[20] Congress intended to promote a national cellular network and to secure lower prices and better service for consumers by opening all telecommunications markets to competition.[21]  One of the ways in which the TCA accomplishes these goals is by reducing impediments imposed by local governments upon the installation of wireless communications facilities, such as antenna towers.[22] The TCA does not, however, abolish all local authority. It tries to balance its goals with the preservation of some local authority over land use.  Put simply, the TCA "attempts to reconcile the

---

[20]*City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005).

[21]*Second Generation*, 313 F.3d at 631.

[22]*Abrams*, 544 U.S. at 115.

interests of consumers and residents (many of whom are themselves cell phone users)."[23]

The TCA places six restrictions on the authority of local government to regulate the placement, construction, and modification of personal wireless service facilities.[24]  Two of these restrictions are at issue in this case:

- Any decision by a local authority denying a request to place, construct, or modify a personal wireless facility must be supported by substantial evidence contained in a written record[25]; and

- Local authorities "shall not prohibit or have the effect of prohibiting the provision of personal wireless services."[26]

To that end, T-Mobile's first claim in this lawsuit is that the Board of Commissioners' decision to deny its request for Special Use Permit is not supported by substantial evidence and thus violates the TCA.  Judicial review under the substantial evidence standard, even at the summary judgment stage, is quite narrow and highly deferential to the local decision-making entity.[27] The court is limited to reviewing only the administrative record to see if it contains substantial evidence to support the local board's decision.[28]

T-Mobile's second claim asserts that the Board of Commissioners' decision to deny its request for Special Use Permit effectively prohibits T-Mobile from providing wireless service in the

---

[23]*Second Generation*, 313 F.3d at 631.

[24]*U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow*, 340 F.3d 1122, 1132-33 (10th Cir. 2003) ("*Broken Arrow*") (citing 47 U.S.C. § 332(c)(7)(B)).

[25]47 U.S.C. § 332(c)(7)(B)(iii).

[26]47 U.S.C. § 332(c)(7)(B)(i)(II).

[27]*Second Generation*, 313 F.3d at 627-28.

[28]*Id.*

29

area at issue.  Unlike a substantial evidence claim, the parties readily acknowledge that an effective

prohibition claim is reviewed *de novo* and may be based on newly proffered evidence.[29]

> **A.      Whether the Unified Government's Denial of T-Mobile's Application to Construct a Wireless Communication Tower was Supported by Substantial Evidence.**

> **1.      The Substantial Evidence Standard**

Under 47 U.S.C. § 332(c)(7)(B)(iii), "[a]ny decision by a State or local government or

instrumentality thereof to deny a request to place, construct, or modify personal wireless service

facilities shall be in writing and supported by substantial evidence contained in a written record."

Section 332(c)(7)(B)(iii)'s substantial evidence requirement "does not 'affect or encroach upon the

substantive standards to be applied under established principles of state and local law.'"[30] Thus, the

Court looks to the requirements set forth in the local zoning ordinance to ascertain the substantive

criteria to be applied.[31]  In sum, "[t]he reviewing court's task is to determine whether the [local

authority's] decision, as guided by local law, is supported by substantial evidence."[32]

It is well-settled that judicial review under the substantial evidence standard is quite narrow.[33]

---

[29]T-Mobile's Memorandum in Support of Summary Judgment (doc. 23), Section IV(A) at p.50 (citing *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 833 (7th Cir. 2003); The Unified Government's Memorandum in Support of Summary Judgment (doc. 29), Section II(A) at p.27 (citing *Second Generation*, 313 F.3d at 629 (citing authority)).

[30]*Broken Arrow*, 340 F.3d at 1133 (citing *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999)).

[31]*Id.* (citation omitted).

[32]*Id.* (citation omitted).

[33]*Id.* (citing *Ready Mixed Concrete Co. v. N.L.R.B.*, 81 F.3d 1546, 1551 (10th Cir. 1996); *Am. Trucking Ass'ns, Inc. v. I.C.C.*, 703 F.2d 459, 462 (10th Cir. 1983) ("It is axiomatic that the scope of review by an appellate court of a Commission decision is a narrow one").

That said, the Court's review, though highly deferential, is not a rubber stamp.[34] The court is limited to reviewing only the administrative record to see if it contains substantial evidence to support the Board of Commissioners' decision.[35] "Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decision maker]. Substantial evidence requires more than a scintilla but less than a preponderance."[36] Significantly, if the evidence can support one of two conclusions, the court must affirm the administrative agency's decision on summary judgment and not substitute its own judgment for that of the local board.[37]

### 2.   Procedural and Substantive Requirements in Local Zoning Ordinances

As a general rule, section 27-260 of the Kansas City, Kansas Code requires acting bodies like the Board of Commissioners to make decisions based upon specific Code requirements and the following considerations: "(1) Conformance with these regulations, the comprehensive plan, and other adopted plans, design guidelines and policies; (2) Recommendations of staff and recommending bodies; (3) Input of reviewing agencies and departments; (4) Public comment and testimony received at the hearing; and (5) Effects of the proposal on the neighborhood, area, and community-at-large."[38]

With regard to Special Use Permits, section 27-279 of the Code dictates that approval or

---

[34]*Id.* (citations omitted).

[35]*Second Generation,* 313 F.3d at 627-28.

[36]*Broken Arrow*, 340 F.3d at 1133 (quoting *Sandoval v. Aetna Life & Cas. Ins. Co.*, 967 F.2d 377, 382 (10th Cir. 1992).

[37]*Id.* (citing *Curtis, Inc. v. I.C.C.*, 662 F.2d 680, 685 (10th Cir. 1981)).

[38]Kansas City, Kansas Code § 27-260.

denial of Special Use Permit must be based on consideration of the following factors:

a.      The character of the neighborhood.

b.      Whether the proposed use will increase the amount of vehicular traffic to the point where it exceeds the capacity of the street network to accommodate it.

c.      Where applicable, hours of operation.

d.      Whether the proposed use is reasonably necessary for the convenience and welfare of the public and will not substantially or permanently injure the appropriate use, visual quality, or marketability of adjoining property.

e.      Whether the noise, vibration, dust, or illumination that would normally be association with such use is of such duration and intensity as to create problems for nearby property.

f.      Whether the proposed use would pollute the air, land or water.

g.      Compatibility with existing and proposed land uses in the surrounding area.

h.      Whether the use would damage or destroy an irreplaceable natural resource.

i.      The relative gain to the public health, safety, morals, and welfare as compared to the hardship imposed upon the individual landowner or landowners.

j.      The applicant's ability to maintain the use in an "as proposed" condition.

k.      Whether the proposed use would result in overcrowding of land or cause an undue concentration of population.

l.      In general, commercial and industrial Special Use Permits should not be granted adjacent to residential districts.[39]

---

[39]Kansas City, Kansas Code §§ 27-279(f)(4)(b), 27-279(f)(5).

### 3.     The Unified Government's Reasons for Denying T-Mobile's Application

The Written Denial provides three[40] reasons for the Board of Commissioners' decision to deny the special use application: (a) T-Mobile "failed to show that denial of the Special Use Permit will prohibit the provision of personal wireless services"; (b) "This particular 120 foot tower is not the least intrusive means of fulfilling a gap, if any exists, in the particular service provided by T-Mobile"; and (c) "The Board of Commissioners has considered the '*Golden*' factors set forth in the City Staff Report and for the reasons stated herein denies [the Application]."[41]  Thus, the issue presented in this section is whether the reasons cited in the Written Denial are supported by substantial evidence in the administrative record.

### a.     Reason One: No Prohibition of Wireless Services

In the Written Denial, the Board of Commissioners determined that T-Mobile had "failed to show that denial of the Special Use Permit will prohibit the provision of personal wireless services." In support of this determination, the Board of Commissioners made the following three findings: (1) drive studies indicated there were no dropped calls in the area surveyed; (2) there was no evidence

---

[40]The fourth numbered statement is simply a description of the contents of the administrative record, and accordingly is not challenged by Plaintiff as a basis for denial.

[41]The *Golden* factors mentioned in the Written Denial refer to the Kansas Supreme Court's listing of factors that a zoning body should consider when hearing requests for zoning changes. *See Golden v. City of Overland Park*, 224 Kan. 591, 598, 584 P.2d 130, 136 (1978) (identifying the following factors for consideration: character of neighborhood; zoning and uses of properties nearby; suitability of the subject property for the uses to which it has been restricted; extent to which removal of the restrictions will detrimentally affect nearby property; the length of time the property remained vacant as zoned; the relative gain to the public health, safety, and welfare by the destruction of the value of the plaintiff's property as compared to the hardship imposed upon the individual landowner; consideration of staff recommendations; and the conformance of the requested change to the master plan). Most of the factors listed by the *Golden* court are embodied in sections 27-279(f) and 27-260 of the Code.

of any gap in service by other providers; and (3) T-Mobile did not submit any service propagation study plans contemplating shorter towers or locations on existing towers or buildings.

### (1)       Dropped Calls in Area Surveyed

Relying on drive studies submitted by T-Mobile that showed no dropped calls, and comparing these statistics with drive studies submitted by other applicants that did show dropped calls, the Board of Commissioners concluded T-Mobile's proposed tower was not necessary. T-Mobile argues this finding is not supported by substantial evidence because (a) the studies submitted in support of other applications for cellular towers are not part of the underlying record; thus a dropped call comparison is not supported by any evidence, let alone substantial evidence; (b) the Board of Commissioners misconstrued the purpose and function of the drive study conducted; and (c) the Board of Commissioners ignored evidence submitted by T-Mobile concerning dropped calls.

### (a)       *Studies Submitted by Other Applicants*

In its Written Denial, the Board of Commissioners specifically compared T-Mobile's drive studies to drive studies submitted for other applications: "Drive studies indicated that there were no dropped calls in the area surveyed in stark contrast to studies submitted for other applications for cellular towers.  Indicating zero or limited dropped calls seems to indicate this tower is not necessary for the convenience of the public."  The studies submitted by other applicants, however, are not part of the underlying administrative record.  Although there are scattered references in the record to an alternative provider that performed a drive test study, the alternative provider's drive tests and resulting data are not part of the record and were not produced to T-Mobile as part of the

administrative record.[42]  Because the studies submitted in support of other applications for cellular towers are not part of the underlying record, the Court finds that the Board of Commissioners' dropped call comparison is not supported by substantial evidence.

    *(b)  The Purpose and Function of the Drive Study*

   T-Mobile asserts the Board of Commissioners' finding that there were no dropped calls in the area surveyed is not supported by substantial evidence because the Board of Commissioners' finding relies on a drive study that was not designed to, and therefore did not, measure or show dropped calls. T-Mobile maintains it submitted evidence to the Board of Commissioners that the drive study was designed to measure the level of coverage of the network for a particular area, not incidents of dropped calls.  In fact, T-Mobile argues it repeatedly explained during the administrative process that drive tests did not measure or show dropped calls, but instead measured level of network coverage.  In support of this argument, T-Mobile submits the March 30, 2006 Supplemental Coverage Report for the Proposed Site given to City Staff:

> The drive-test study . . . is an actual measurement of the coverage of the network. This test is done by driving in a car in and around the area of interest with a phone which is hooked up to a GPS. In this way it is possible to determine the actual "on-street" coverage level of the network at all of the locations where the car drives. This test can be useful for comparison to the propagation prediction study, and can therefore validate that there are areas, such as part of Kansas City, KS where T-Mobile has a significant gap in coverage.

    *  *  *  *  *  *  *  *  *  *

---

  [42]Based on a transcript of the April 10, 2006 meeting to which T-Mobile refers, but which the Unified Government did not produce as part of the record, it appears that Planning Director Richardson may have displayed a map of dropped call data submitted by Cingular in support of its Application.  It further appears, however, that the Unified Government never gave T-Mobile a copy of Cingular's map, and the Unified Government did not include the map as part of the underlying administrative record.

The drive test results, which follow, experimentally confirm the propagation prediction analysis that demonstrated a significant gap in coverage in the T-Mobile network. The signal levels measured in this drive test were "on-street" equivalents and as such they may be compared in an apples-to-apples fashion with the data from the propagation predictions which also depict "on-street" levels.

*   *   *   *   *   *   *   *   *   *

These drive test results are generally confirmatory of the propagation prediction studies, even though they reveal the propagation predictions to be at some places optimistic and at others pessimistic. The significant gap in coverage revealed by the propagation study is clearly confirmed in the drive test results. For the most part, the drive test results proved to match the computer generated predictions.

*   *   *   *   *   *   *   *   *   *

The drive test shows that in-vehicle [coverage] in the area of concern is marginal and replicates that shown by the propagation studies in this report. Because a house has more loss than a vehicle with a lot of windows, it can be concluded that if the caller is in a house, they would experience even worse coverage than is displayed in the drive test results.

At the May 25, 2006 Board of Commissioners meeting, Commissioner Pettey stated "one of the criteria that's been used is the number of dropped calls. There significantly are not very many dropped calls in this area. Is that correct?" In response, Planning Director Richardson stated

The standard that we had used in the past was the drive test for dropped calls. Their drive test shows no dropped calls. Their computer system shows dropped calls within that area on a weekly basis but I don't believe that's been pinpointed to the sectors of the cells that would apply to where this would go. I don't know that it's fair to say that there aren't any, but they have not been able to pinpoint where those were.

A T-Mobile representative responded by explaining:

I do want to take some exceptions to staff's report. Commissioner Pettey is correct, it does say the information we had provided [from the drive test] showed no dropped calls. The confusion at the beginning of this application was we presented radio frequency propagation maps and a drive test data [that] was a field test that confirmed what the propagation maps were telling us. These maps are based on computer models and what we provided later to [Planning Director Richardson] is a drive test, which confirmed in the field what our maps already told us, that we had

36

a hole in coverage in this particular area and we needed to fill that with a new site. I'm not sure if [Planning Director Richardson] is convinced at this point whether or not we do have a significant issue in this area. Absolutely 100% we would not be before this body if we didn't believe we have a significant coverage issue in this area. These facilities cost hundreds of thousands of dollars to put up a site. It's not to our business advantage to waste money by putting up sites that aren't necessary. We do have a significant coverage gap issue in this particular location.

A T-Mobile representative further explained the coverage gap by stating:

We do have a significant coverage issue. [Planning Director Richardson] had focused on dropped calls and these maps don't show you dropped calls and neither does the drive test data that we presented earlier. We had to present that to [Planning Director Richardson] separately in some follow up meetings and we did give [him] some data. We had tested the site on two separate weeks and in each of those tests we had over 1,800 dropped calls in this particular area the last week of February. In the first week of May we ran the test again and we had over 2,700 dropped calls in this area. I mentioned before this is an issue of coverage and an area of issue in capacity. It's not to say that we don't have some coverage in the area, but it is very unreliable and certainly not up to the standards of T-Mobile or [its] customers and what they expect to receive in the terms of service when they're paying for it. We clearly have a coverage gap issue and we have the [Radio Frequency] engineer if you'd like to ask more questions about that.

Upon review of the evidence and testimony set forth above, the Court finds the Board of Commissioners erroneously relied on the drive studies to conclude that there were no dropped calls in the area surveyed.  Because the Board of Commissioners' conclusion that there were no dropped calls is based upon a faulty premise, the Court finds such conclusion is not supported by substantial evidence.

### (c) Evidence Regarding Dropped Calls

T-Mobile asserts it presented evidence of a significant number of dropped calls in the area at issue, which the Board of Commissioners ignored.  First, T-Mobile states its presented evidence that in one week, its in-building customers in the area experienced 1,812 dropped calls, and that in a subsequent week, that number substantially increased to over 2,700 dropped calls.  T-Mobile

further explained to the Planning Commission that the area averages 300 dropped calls a day.

In response to this evidence, Planning Director Richardson acknowledged that T-Mobile's computer system shows dropped calls on a weekly basis, but Richardson insisted upon receiving dropped call data pinpointed on a map – he wanted to know where, when, and the number of dropped calls.   After the March 13, 2006 hearing, but before the April 10 hearing, T-Mobile provided evidence of the "when," "where," and "number" of dropped calls (as set forth in the preceding paragraph), but not affixed onto a map.

At the May 25 Board of Commissioners meeting, Commissioner Mitchell stated: "You're showing a certain test and [Planning Director Richardson] is asking for a different test, are you familiar with the test [he] is asking for?"  In response, T-Mobile's representative stated:

> We don't have maps that represent dropped call data [which is what Planning Director Richardson is asking for]. We know what [Planning Director Richardson] wants and it's dropped call data. We have since met with [Planning Director Richardson] personally and confidentially and provided him with dropped call data [but it is not affixed onto a map]. I've mentioned earlier that we do have testing that shows we have had in two different weeks 1,700 dropped calls and 2,700 dropped calls in a week on this particular location. We do have dropped call data if that is important consideration for you because it really hadn't been in the past. It does buffer what we're telling you.

To this explanation, Planning Director Richardson again acknowledged there were dropped calls, but responded that:

> [o]n page five of the City Staff Report, in the fourth paragraph under D155, it says [T-Mobile has] 280 minutes of use per dropped call in this area. If I had that much service out of my cell phone, I would think that was pretty good. I don't think anyone in this room gets that kind of service. I don't deny there's some kind of need here, but basically they gave us the dropped call drive test and there weren't any on the drive test and their data shows they get 280 minutes of use in their system per dropped call.

In response, the T-Mobile representative stated:

What we have provided subsequent to providing this information to [Planning Director Richardson], in private because [T-Mobile does not] like handing out its dropped call data, is the dropped call data that shows that we have 1,700 and 2,700 dropped calls in two different weeks. [Planning Director Richardson's] point that [280 minutes] without a dropped call is good, isn't good in the industry. The industry averages 310 minutes without a dropped call and we're well below that. . . . Our competitors are going to walk all over us in Wyandotte County if we provide that kind of service to our customers.

Based on the testimony and evidence set forth above, T-Mobile argues the Board of Commissioners blatantly ignored evidence submitted by T-Mobile concerning dropped calls in finding that there were no dropped calls. In response, the Board of Commissioners argues that it did not "ignore" the evidence of dropped calls, but simply drew a different conclusion from the evidence than that of T-Mobile.  The Unified Government argues that substantial evidence for the Board's decision still exists, even if two different conclusions can be drawn from the same evidence.

Although the Court agrees with the general proposition that substantial evidence may exist to support a decision even if alternative decisions could be drawn from the same evidence, the Court finds that is not the case here. The Board of Commissioners' reliance on a drive study that was never meant to measure dropped calls and the personal opinion of a Planning Director Richardson that 280 minutes of use per dropped call in this area is "pretty good" is inadequate to support the Board of Commissioners' conclusion that there were no dropped calls in the area surveyed.  Simply put, the evidence on which the Board of Commissioners relied is not such that a reasonable mind might accept as adequate to support the Board of Commissioners' finding that there were no dropped calls in the area at issue, especially given that such a conclusion is overwhelmed by substantial evidence submitted to the contrary, i.e., an average of 300 dropped calls per day in the targeted area.

### (2)     Evidence of a Gap in Service by Other Providers

Next, the Board of Commissioners argues that by failing to provide evidence of a gap in service by other providers, T-Mobile failed to establish that denial of its application will prohibit the provision of personal wireless services.  In response, T-Mobile argues gaps in service by other providers is irrelevant to whether T-Mobile is prohibited from providing personal wireless services.

The arguments presented by the parties rely on the legal concept that a local entity may violate the TCA's "effective prohibition" clause if it prevents a wireless provider from closing a "significant gap" in service coverage.[43]  Where the parties diverge on this concept is the legal question of whether a "significant gap" in coverage should be determined from the consumer's perspective or from the individual provider's perspective.  The circuits are divided and the Tenth Circuit has yet to rule on the issue.

The test employed by the Second and Third Circuits holds that a "significant gap" in service exists only if no provider is able to serve the "gap" area in question.[44]  This test is sometimes referred to as the "one provider" rule because, if any single provider offers coverage in a given area, localities may preclude other providers from entering the area.  This rule yields to the consumer's perspective rather than the individual service provider's perspective, which the Third Circuit argues is more in keeping with the regulatory goals of the TCA.  In other words, as long as some provider offers service in the area, consumers will be adequately served and the TCA's goal of establishing

---

[43]*See MetroPCS, Inc. v. City and County of San Francisco*, 400 F.3d 715, 732 (9th Cir. 2005) ("*MetroPCS*"); *Second Generation*, 313 F.3d at 632-33; *Nextel West Corp. v. Unity Twp.*, 282 F.3d 257, 265 (3d Cir. 2002); *APT Pittsburgh Ltd. P'ship v. Penn Twp.*, 196 F.3d 469, 478-80 (3d Cir. 1999); *Sprint Spectrum L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).

[44]*Nextel West Corp. v. Unity Twp.*, 282 F.3d at 265; *APT Pittsburgh Ltd. P'ship v. Penn Twp.,* 196 F.3d at 478-80; *Sprint Spectrum L.P. v. Willoth*, 176 F.3d at 643 (2d Cir. 1999).

nationwide wireless service will be achieved.[45]   Under this view, the TCA protects only the individual user's ability to receive service from one provider or another provider; it does not protect each service provider's ability to maintain full coverage within a given market.[46]

The First Circuit and the Ninth Circuit have rejected the "one provider" approach and held that a local regulation creates a "significant gap" in service – and thus effectively prohibits wireless services – if the provider in question is prevented from filling a significant gap in its own service network.[47]   This approach takes the perspective of the individual service provider in assessing coverage gaps.  Such an approach better serves both the individual consumers and the policy goals of the TCA in that it secures lower prices and better service for consumers through competition in the telecommunications market.[48]  Given the current structure of the wireless services market, "[t]he fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers."[49]  "It is highly unlikely that Congress intended the many qualitatively different and complex problems to be lumped together and solved by a rule for all seasons that any coverage in a gap area automatically defeats an effective prohibition claim."[50]

Applying an example from the *Second Generation* case to the facts here, it is of little comfort

---

[45]*Nextel West Corp. v. Unity Twp.*, 282 F.3d at 265.

[46]*Id.*

[47]*MetroPCS*, 400 F.3d at 732; *Second Generation*, 313 F.3d at 632-33.

[48]*Second Generation,* 313 F.3d at 631 (citing H.R. Conf. Rep. No. 104-458, at 113 (1996)).

[49]*Id.* at 633.

[50]*Id.*

to the customer who uses T-Mobile (or Verizon or Sprint or Nextel) – who cannot get service along a significant geographic gap which may exist – that a Cingular customer does get some service in that gap.[51]  Although the T-Mobile customer could switch to Cingular, the customer might well find that she has a significant gap in coverage a few towns over, where T-Mobile, her former provider, offers service but Cingular does not.[52]  Thus, a rule dictating that "any service equals no effective prohibition" creates an untenable patchwork of intermittent coverage, which may well have the effect of driving the industry toward a single carrier.[53]  Such a result thwarts the goal of Congress to encourage competition in the wireless services industry.[54]

Upon review of the policy considerations and practical implications of the two approaches discussed above, the Court determines the approach taken by the First and Ninth Circuits is the better alternative.  Accordingly, the Court holds that a significant gap in service (and thus an effective prohibition of service) exists when a provider is prevented from filling a significant gap in its own service coverage.

Given this holding, the Court finds T-Mobile's failure to provide evidence of a gap in service by other providers is immaterial to whether denial of T-Mobile's application will have the effect of prohibiting T-Mobile from providing personal wireless services.  Thus, T-Mobile's failure to provide

---

[51]*See id.*

[52]*See id.*

[53]*Id.*

[54]The legislative history of the TCA describes its purpose as follows: "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition."  H.R. Conf. Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124.

evidence of a gap in service by other providers is not evidence that a reasonable mind might accept as adequate to support the Board of Commissioners' finding that denying the Special Use Permit will not prohibit provision of personal wireless services.

> **(3)** **Submission of Service Propagation Study Plans Contemplating Shorter Towers or Locations on Existing Towers or Buildings**

The Board of Commissioners asserts that by failing to submit any service propagation study plans contemplating shorter towers or locations on existing towers or buildings, T-Mobile failed to establish that denial of its application will prohibit the provision of personal wireless services.  T-Mobile disagrees with the Board of Commissioners' assertions regarding such a submission and maintains that T-Mobile provided a propagation study in both its Coverage Report and Supplemental Coverage Report.  More specifically, T-Mobile asserts that the propagation studies submitted to the Board of Commissioners demonstrate that co-location on the High School Tower will not fill T-Mobile's coverage gap.  T-Mobile further asserts that it submitted an affidavit and gave testimony at the March 13 Planning Commission hearing and the May 25 Board of Commissioners meeting explaining that the High School Tower is not a viable site for an antenna to remedy T-Mobile's coverage gap. Finally, T-Mobile asserts that it submitted evidence to demonstrate that T-Mobile considered structures within the one-mile radius of the search ring, including water towers owned by the Unified Government and BPU, as well as tall buildings and existing telecommunication towers.

In responsive briefing, the Unified Government concedes T-Mobile did submit the referenced propagation study and that the Board of Commissioners' findings are erroneous in this regard. Notwithstanding this error, the Unified Government argues the proposition for which this finding

ultimately stands – that T-Mobile failed to provide a sufficient number of propagation studies showing coverage of alternative plans – adequately supports the conclusion that T-Mobile failed to establish denial of its application will prohibit the provision of personal wireless services.

The Unified Government relies on the following two Tenth Circuit cases to suggest that all applicants wishing to obtain Special Use Permits to build a telecommunications tower must prove that alternative locations do not provide sufficient coverage.

In *United States Cellular Corporation v. Board of Adjustment of the City of Seminole, Oklahoma,*[55] the court concluded that denial of a request for a variance from setback requirements was supported by substantial evidence and did not violate the Act.  In *Seminole*, however, the local zoning ordinance specifically stated "[t]he application should look at co-location on an existing tower, and if not feasible, indicate why it is not feasible."[56]  Although the applicants in *Seminole* claimed that alternative sites did not provide sufficient coverage, they did not provide supporting evidence as specifically required by the local zoning ordinance.[57]  The *Seminole* court found that the "local ordinance placed the burden" on the applicants "to explain why they could not co-locate on an existing tower, and the record does not show they satisfactorily responded to staff's questions or requests for clarification on co-location."[58]  Unlike the *Seminole* case, the Code at issue in this case imposes no burden on T-Mobile to explain why it cannot co-locate on existing towers or use alternative sites for new construction.  In other words, the facts of the *Seminole* case are readily

---

[55]180 Fed. Appx. 791, 798, 2006 WL 1288596, at *12 (10th Cir. May 11, 2006).

[56]*Id.* at 798.

[57]*Id.* at 802.

[58]*Id.* at 804.

distinguishable.

The Unified Government also relies on *United States Cellular Telephone of Greater Tulsa, L.L.C. v. City of Broken Arrow, Oklahoma*[59] for its contention that T-Mobile had the burden of "develop[ing] a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers." But, as in *Seminole*, the *Broken Arrow* court made its decision in the context of a local zoning ordinances that expressly required the applicant to "demonstrate[ ] to the City Council's reasonable satisfaction that no existing tower or other structure can accommodate the applicant's proposed antenna."[60] The Tenth Circuit found that the applicant "offered no substantive evidence concerning the feasibility of co-locating" at alternative locations, and that the evidence in the record supported the city council's denial based on the applicant's failure to establish to the city council's reasonable satisfaction that no co-location opportunities were available.[61] Here, again, the Unified Government's Code imposes no such requirement on T-Mobile, and there was, therefore, no burden, as the Unified Government suggests, on T-Mobile to develop such a record.

Unlike the case before the Court today, each of the cases upon which the Unified Government relies involved local zoning authorities with express regulations requiring applicants to show alternative sites are not feasible. There is no evidence of such regulations or ordinances in this case. Accordingly, the fact that T-Mobile did not provide more than one alternative location

---

[59]340 F.3d 1122 (10th Cir. 2003).

[60]*Id.* at 1124.

[61]*Id.* at 1137.

45

feasibility study cannot constitute substantial evidence on which to base a denial.[62]

Even if there was a requirement to show alternative sites are not feasible, the Court finds a denial on this basis is not supported by substantial evidence. The record reflects T-Mobile presented evidence that the Board of Public Utilities' ("BPU") tower is outside T-Mobile's radio frequency search ring and, therefore, an antenna co-located on it will not fill T-Mobile's coverage gap. T-Mobile also presented evidence that the High School Tower is not a feasible alternative because it, too, is outside the [radio frequency] search ring.  Finally, T-Mobile submitted evidence to demonstrate that T-Mobile considered structures within the one-mile radius of the search ring, including water towers, tall buildings, and existing telecommunication towers.

As to the Board of Commissioners' position that T-Mobile should have submitted propagation studies for a "greater number of shorter 'stealth' towers," T-Mobile presented evidence that it needed an antenna at a certain height in order to fill the coverage gap.  Even if this were not the case, there is nothing in the written record to indicate that City Staff or the Board of Commissioners ever asked T-Mobile to consider constructing more shorter towers instead of one taller stealth tower. In fact, Planning Director Richardson stated that he is not certain he would even support such an application.

With evidence in the record explaining that co-location on the High School Tower, the BPU water tower, or any other structure within the one-mile radius of the search ring was not feasible, the

---

[62]*See AT&T Wireless Servs. of Cal., LLC v. City of Carlsbad*, 308 F. Supp. 2d 1148, 1163-64 (S.D. Cal. 2003) (holding that city's denial based on finding that applicant did not demonstrate that there were no feasible alternatives was not supported by "substantial evidence" where such policy was not in effect at the time of applicant's permit application) (citing *New Par v. City of Saginaw*, 301 F.3d 390, 398 (6th Cir. 2002)*; Group EMF, Inc. v. Coweta County*, 131 F. Supp. 2d 1335, 1343 (N.D. Ga. 2000)).

Court finds there is a lack of substantial evidence to support the Unified Government's contention that, by failing to submit any service propagation study plans contemplating shorter towers or locations on existing towers or buildings, T-Mobile failed to establish that denial of its application will prohibit the provision of personal wireless services.[63]

> **b.      Reason Two: Not Least Intrusive Means of Filling a Service Gap**
>
> **(1)      The Appropriate Least Intrusive Standard: No Other Viable Alternatives versus Visually Unobtrusive versus Least Intrusive on Values Denial Sought to Serve**

In the Written Denial, the Board of Commissioners determined "[t]his particular 120 foot tower is not the least intrusive means of fulfilling a gap, if any exists, in the particular service provided by T-Mobile." Although nothing in federal, state, or local law imposes an obligation upon T-Mobile to establish that its proposed tower is the "least intrusive means" to fill its coverage gap, various courts have utilized this "least intrusive means" standard to determine whether a proposed telecommunication tower is necessary to resolve a significant gap in telecommunication services. Under all existing versions of the "significant gap" test utilized by the courts, a wireless service provider must first demonstrate that a significant gap in coverage exists. Then, the provider must make some showing as to the intrusiveness of its proposed means of closing that gap.

---

[63]*Cf. Virginia Metronet, Inc. v. Bd. of Sup'rs of James City County*, 984 F. Supp. 966, 976 (E.D. Va. 1998) (finding that denial based on applicants failure "to convincingly demonstrate that no other site alternatives existed" was not based on substantial evidence where (1) applicant presented a report examining potential sites and explaining why applicant declined those sites and (2) there was no evidence of other unconsidered sites in the record); *Primeco Personal Commc'ns, Ltd. P'ship v. City of Mequon*, 242 F. Supp. 2d 567, 577 (E.D. Wis. 2003), *aff'd* 352 F.3d 1147 (7th Cir. 2003) (finding that commission's denial based on conclusion that alternative sites were available was not based on substantial evidence where all evidence introduced indicated that the sites at issue were not adequate alternatives and there was no evidence in the record indicating that such sites were technologically feasible alternatives).

Notably, the circuits are split as to the level of intrusiveness required to meet this standard and the Tenth Circuit has not addressed the issue.  The Second and Third Circuits require the provider to show that "the manner in which it proposes to fill the significant gap in service is the least intrusive on the values that the denial sought to serve."[64]   The First, Seventh, and Eighth Circuits, by contrast, require a showing that there are no other viable options.[65]

Here, the parties disagree regarding the appropriate standard to utilize in this case.  The Unified Government argues this Court should adopt the "no other viable options" standard.  T-Mobile, however, urges the Court to create a new "visually unobtrusive" standard; in other words, if the proposed tower or antenna site is visually unobtrusive, then it automatically qualifies as the least intrusive means of closing the gap in coverage.

Since there is no controlling legal authority on the issue, the choice of rule must ultimately come down to policy considerations. As a preliminary matter, the Court finds T-Mobile's "visually unobtrusive" rubric seems a hopelessly subjective standard and fails to contemplate any meaningful comparison of alternative sites in order to identify the best solution for the community in selecting a site for a proposed facility.[66] Accordingly, the Court rejects the "visually unobtrusive" standard.

In its papers, the Unified Government argues that the Tenth Circuit would adopt the First, Seventh, and Eighth Circuits' "only feasible alternative test" because the Tenth Circuit Court of

---

[64]*Omnipoint Commc'ns Enterprises, L.P. v. Zoning Hearing Bd.,* 331 F.3d 386, 398 (3d Cir. 2003); *Sprint Spectrum L.P. v. Willoth*, 176 F.3d at 643 (Second Circuit).

[65]*Second Generation*, 313 F.3d at 635 (First Circuit); *Voicestream Minneapolis, Inc. v. St. Croix County*, 342 F.3d at 834-35 (Seventh Circuit); *U.S.C.O.C. of Greater Iowa, Inc. v. Zoning Bd. of Adjustment*, 465 F.3d 817 (8th Cir. 2006).

[66]*See MetroPCS*, 400 F.3d at 735.

Appeals previously has declared that, in order "[f]or a telecommunications provider to argue that a permit denial is impermissible because there are no alternative sites, it must develop a record demonstrating that it has made a full effort to evaluate the other available alternatives and that the alternatives are not feasible to serve its customers."[67]

The Court is not persuaded by the Unified Government's argument. This is because the local zoning ordinance at issue in *Broken Arrow*, unlike this case, explicitly requires an applicant to demonstrate that there were no alternative sites available. Thus, the need for substantial evidence (or a developed record) arose because some evidence concerning alternative sites was mandated.[68] When analyzed in this context, the quotation upon which the Unified Government relies lends no support to the contention that the Tenth Circuit would adopt the "only feasible alternative" test.

Moreover, other courts within the Tenth Circuit that have addressed effective prohibition claims under the Act have not adopted the "only feasible alternative" test.[69]  Requiring a provider to demonstrate that its proposed facility is the only viable option seems too exacting. In a situation where there are several viable means of closing a major service gap, this "only viable option" rule would either preclude the construction of any facility (since no single site is the "only viable"

---

[67]*Broken Arrow*, 340 F.3d at 1137 (10th Cir. 2003) (quoting *Sw. Bell Mobile Sys., Inc. v. Todd*, 244 F.3d 51, 63 (1st Cir. 2001)).

[68]*See id.* at 1124-1125 (code required applicant "to demonstrate to the City Council's reasonable satisfaction that no existing tower or other structure can accommodate the applicant's proposed antenna").

[69]*See Nextel West Corp. V. Town of Edgewood*, No. 05-751-MCA/RLP, 2006 WL 4390893, at *20 (D.N.M. Sept. 26, 2006) (applying least intrusive alternative standard); *Western PCS II Corp. v. Extraterritorial Zoning Auth.*, 957 F. Supp. 1230, 1238 (D.N.M. 1997) (applying no discernable test and holding that denial violated Act's effective prohibition clause where denial had effect of preventing provider from providing advanced digital cellular communications technology to compete with its analog cellular competitors in area in question).

alternative) or require providers to endure repeated denials by local authorities until only one feasible alternative remained. This seems a poor use of time and resources for both providers and local governments alike.

In contrast to the discretionary "visually unobtrusive" analysis and the rigid "no viable alternative" test, the Court finds that the Second and Third Circuits' "least intrusive on values the denial sought to serve" standard is the appropriate standard to apply.  This standard allows for a meaningful comparison of alternative sites before the siting application process is needlessly repeated. In other words, the standard requires a showing that a good faith effort has been made to identify and evaluate less intrusive alternatives, e.g., that the provider has considered less sensitive sites, alternative system designs, alternative tower designs, placement of antennae on existing structures, etc.[70]  It also gives providers an incentive to choose the least intrusive site in their first siting applications, and it promises to ultimately identify the best solution for the community, not merely the last one remaining after a series of application denials. For these reasons, the Court will adopt the "least intrusive on values the denial sought to serve" standard.

### (2)    Application of the Least Intrusive Means Standard

Given adoption of this standard, the Court now must determine whether there is significant evidence to support the Board of Commissioners' finding that the proposed tower is not the least intrusive means of fulfilling the gap in service based on the values the Board of Commissioners' denial sought to serve.  To that end, the Board of Commissioners made the following three findings: (1) local ordinances create a preference for commercial districts over residential with regard to

---

[70]*Penn Twp.*, 196 F.3d at 480 (adopting the "least intrusive on values the denial sought to serve" standard); *see also MetroPCS*, 400 F.3d at 735 (adopting standard from *Penn Twp.*).

telecommunications towers; (2) the property for which the Petition was filed is zoned R-1(B) Single Family; and (3) the tower is not aesthetically attractive and would create blight in the views of the surrounding residential properties.

### (a)    Preference for Commercial Districts

Section 27-1252(32) of the Code specifically authorizes the Unified Government to issue Special Use Permits for telecommunications antennas and towers if certain mandatory conditions are met.  There are eight mandatory conditions altogether and each condition is specifically set forth within the ordinance in outline form.  At the end of the ordinance, after the outline of mandatory conditions, is the following statement: "In evaluating such proposed sites, commercial districts are generally preferred over those in residential districts as are sites in less restrictive residential or commercial districts generally preferred over those in more restrictive districts."[71]

As a preliminary matter, the Court finds it clear from the way this section of the Code is presented that the stated preference for commercial districts is not a mandatory condition before a special permit can be issued, but instead is only a factor to consider in determining whether a request for Special Use Permit to construct a telecommunication tower should be granted. The Court further finds that, under the circumstances presented here, this stated preference does not rise to the level of substantial evidence supporting the Board of Commissioners' finding that the proposed tower is not the least intrusive means of fulfilling a gap in service provided by T-Mobile. The Master Plan designation for the property is commercial and the property is surrounded primarily by C-3 commercial districts.  In only one direction (to the east) is there a single family residential use.  In fact, both City Staff and the Planning Commission recognized that the "neighborhood is somewhat

---

[71]Kansas City, Kansas Code § 27-1252(a)(32).

commercial in nature" and that there are only a "few residential uses in the general area."  The Board

of Commissioners' consideration of this non-mandatory stated preference for commercial districts,

in isolation and without consideration of contrary factual evidence, is not a reasonable ground on

which to find that the Proposed Site is not the least intrusive means of fulfilling T-Mobile's service

gap.  Thus, the Court finds that the Board of Commissioners' findings in this regard are not based

on substantial evidence in the record.[72]

### (b)    Compatibility of Use

Next, the Unified Government claims the Proposed Site is not the least intrusive means of

fulfilling T-Mobile's service gap because it is on property currently zoned R-1(B) Single Family,

which is "one of the most restrictive zoning classifications," and that the "proposed cell tower is a

new additional use which has no direct relation with the current use of the property although it would

provide additional income to the church."

While compatibility with the existing use (church) and proposed use (telecommunications

tower on church property) is a factor to consider, it is but one of several factors and is not alone

dispositive.[73]  The Board of Commissioners' reliance on this factor to support its least intrusive

means argument fails to acknowledge that a telecommunications tower on the property is not

incompatible with the Master Plan designation (Commercial), and that while it may not have a direct

relation to the church operations, the Church has entered into a lease with T-Mobile that will provide

an income stream to the Church.  Again, the Board of Commissioners' consideration of the fact that

this property is currently zoned R-1(B) Single Family, in isolation and without consideration of

---

[72]*See Golden*, 224 Kan. 591, 584 P.2d at 137.

[73]*See* Kansas City, Kansas Code § 27-279(f)(5).

contrary factual evidence, is not a reasonable ground on which to find that the Proposed Site is not the least intrusive means of fulfilling T-Mobile's service gap.  Thus, the Court finds that the Board of Commissioners' findings in this regard are not based on substantial evidence in the record.[74]

### (c)    Aesthetics

Finally, the Unified Government claims the Proposed Site is not the least intrusive means of fulfilling T-Mobile's service gap because the proposed tower "is not aesthetically attractive in a residential neighborhood and would create blight in the view of the surrounding residential properties." While aesthetics can be a valid ground for local zoning decisions under Kansas law,[75] it can only be a permissible ground for denial of a permit under the Act if it is supported by substantial evidence.[76]  Here, the only evidence in the record on which the Board of Commissioners could possibly have based an aesthetic decision is the photo simulation of the tower facility from nearby properties and streets that T-Mobile submitted with its application.[77]  No owners of surrounding residential properties (or any other person for that matter) opposed the Application or voiced any concerns about the tower's aesthetic impact. Generalized aesthetic concerns do not

---

[74]See Golden,  224 Kan. 591, 584 P.2d at 137.

[75]See R.H. Gump Revocable Trust v. Wichita, 35 Kan. App. 2d 501, 512, 131 P.3d 1268, 1276 (2006) (holding that city's denial of conditional use permit on aesthetic grounds was not unreasonable).

[76]See Cellular Tel. Co. v. Town of Oyster Bay, 166 F.3d at 495 (explaining that while aesthetics is a valid ground for local zoning decisions under New York law, "aesthetics qualify as a permissible ground for denial of a permit [under the Act] only if we can conclude that there was 'more than a mere scintilla' of evidence").

[77]The photo simulation demonstrates that there will be no antennae sticking out of the pole; they will be housed in containers on top of the tower.

constitute sufficient evidence.[78] As such, the Court finds the Board of Commissioners' determination

with regard to aesthetics are wholly unsupported by any evidence in the written record.[79]

      **c.**       **Reason Three: *Golden* Factors Do Not Support Approval**

Finally, in denying T-Mobile's application, the Board of Commissioners considered the

*Golden* factors set forth in the final version of the City Staff Report. The *Golden* factors are a list of

considerations that Kansas courts recommend cities review when deciding zoning changes or special

---

[78]*See Mequon*, 352 F.3d 1147, 1150-51 (7th Cir. 2003) (holding that substantial evidence did not support denial on aesthetic grounds where only "evidence" regarding aesthetic considerations was testimony of three to four residents who said they did not like poles in general); *Omnipoint Commc'ns, Inc. v. The Village of Tarrytown Planning Bd.*, 302 F. Supp. 2d 205, 222 (S.D. N.Y. 2004) ("As a matter of law, however, unsubstantiated community objection to aesthetics is not sufficient evidence by itself to support the Planning Board's denial"); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1219 (11th Cir. 2002) ("Mere generalized concerns regarding aesthetics, however, are insufficient to create substantial evidence justifying the denial of a permit" under the TCA); *USOC of Greater Iowa, Inc. v. City of Bellevue*, 279 F. Supp. 2d 1080, 1086 (D. Neb. 2003) (eight layperson residents raising generalized concerns about aesthetics is not substantial evidence for purposes of the TCA).

[79]*See Oyster Bay*, 166 F.3d at 495-96 (generalized expressions of concern with "aesthetics" cannot serve as substantial evidence); *California RSA No. 4 v. Madera County*, 332 F. Supp. 2d 1291, 1308 (E.D. Cal. 2003) (rejecting photographs as "evidence that could reasonably be accepted as substantial evidence"). *Cf. VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d at 831-32 (finding substantial evidence supported denial based on adverse aesthetic impact where documentation that 185-foot tower would be visible for several miles along the scenic riverway and testimony that tower would interfere with unique scenery of riverway); *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 61-62 (1st Cir. 2002) (finding substantial evidence to support denial where 150-foot tower would be painted in red and white sections with night beacon on top of 50-foot hill in field with no trees in center of the town); *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d at 646 (finding substantial evidence to support board's conclusion of significant negative aesthetic impact where real estate experts stated towers would reduce property values by 10% to 25%); *AT&T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d 423, 431 (4th Cir. 1998) (finding substantial evidence supported denial where there was a "repeated and widespread opposition of a majority of the citizens of Virginia Beach who voiced their views at the Planning Commission hearing, through petitions, through letters, and at the City Council meeting").

use permits.[80] They include: (1) character of the neighborhood; (2) zoning uses of nearby properties; (3) suitability of the property for the uses to which it is restricted; (4) extent to which the change will detrimentally affect nearby property; (5) length of time the property has been vacant as zoned; (6) gain to the public health, safety, and welfare by the possible diminution in value of the developer's property as compared to the hardship imposed on the individual landowners; (7) recommendations of a permanent or professional planning staff; and (8) conformance of the requested change to the city's master or comprehensive plan."[81]

The report of the professional planning staff to the Board of Commissioners, which is one of the *Golden* factors to be taken into account, relied on the following *Golden* factors in recommending denial of the application:

- the character of the neighborhood;

- the aesthetic impact of the proposed tower; and

- the dropped call data.

### (1)  Character of the Neighborhood

City Staff acknowledged that the character of the neighborhood is "somewhat commercial in nature" and that there are "few residential uses in the general area, including some seminary residential uses." And, although the Master Plan does not designate areas for cell towers, the Master Plan designation of the Proposed Site is "commercial." Thus, City Staff's decision to deny the Special Use Permit based on the character of the neighborhood is not supported by substantial

---

[80]*K-S Center Co. v. City of Kansas City*, 238 Kan. 482, 495, 712 P.2d 1186 (1986) (citing *Golden*, 584 P.2d at 137.)

[81]*Bd. of County Comm'rs of Johnson County v. City of Olathe*, 263 Kan. 667, 677, 952 P.2d 1302 (1998) (citing *Golden*, 584 P.2d at 137.)

evidence in the written record.

### (2)    Aesthetic Impact

With respect to consideration of (a) suitability of the property for the uses to which it has been restricted; and (b) any detrimental effect on nearby property if restrictions are removed, City Staff commented only that it "is probable that a tower may be considered unsightly by many."  City Staff, however, fails to support this conclusion with any evidence.  Notably, no one appeared at any of the public hearings to oppose the Application or otherwise voice concerns about it.  Thus, City Staff's decision to deny the Special Use Permit based on aesthetic impact is not supported by substantial evidence in the written record.

### (3)    Dropped Calls

As noted in Section A(3)(a)(1), *supra*, the Board of Commissioners' reliance on a drive study that was never meant to measure dropped calls and the personal opinion of a Planning Director Richardson that 280 minutes of use per dropped call in this area is "pretty good" is inadequate to support the Board of Commissioners' conclusion that there were no dropped calls in the area surveyed.  Simply put, the evidence on which the Board of Commissioners relied is not such that a reasonable mind might accept as adequate to support the Board of Commissioners' finding that there were no dropped calls in the area at issue, especially given that such a conclusion is overwhelmed by substantial evidence to the contrary. Thus, the Court finds that the determinations made by the Board of Commissioners with regard to each of the *Golden* factors considered are not supported by substantial evidence.

In sum, and based on the analyses set forth in Section V(A)(3), *supra*, the Court finds none of the reasons cited by the Board of Commissioners in the Written Denial are supported by

substantial evidence in the administrative record. Although summary judgment in favor of T-Mobile on this basis alone would be justified, the Court finds it appropriate under the circumstances here to go on to determine whether denial of T-Mobile's Application had the effect of prohibiting the provision of personal wireless services in violation of the TCA.

### B.     Prohibits or Has the Effect of Prohibiting Provision of Wireless Services

T-Mobile asserts that the Written Denial effectively prohibits it from providing wireless services in the designated area.  The Unified Government disagrees, arguing that the Act's effective prohibition clause only applies to "instances in which cities either have general bans against personal wireless services, or policies that are so strict that they would effectively guarantee that every application would be rejected."[82]  In the alternative, the Unified Government argues that even in the absence of a "general ban" on wireless services, the Unified Government did not violate the TCA's "effective prohibition" clause because there is not a "significant gap" in service coverage in the area at issue and, even if there was, the proposed tower is not the "least intrusive means" to close the coverage gap.

### 1.     Legal Standards

#### a.     Standard of Review

Unlike a review of the administrative record to determine whether "substantial evidence" exists to support a decision rendered by a local commission, the Court applies a *de novo* standard of review when examining a local commission's interpretations of the Telecommunications Act and

---

[82]Unified Government's Memorandum in Opposition to Summary Judgment (citing *AT&T Wireless PCS, Inc. v. City Council of the City of Va. Beach*, 155 F.3d at 428-29).

its regulations, as those decisions turn on determinations of federal law.[83]   The anti-prohibition

clause "present[s] questions that a federal district court determines in the first instance without any

deference to the [Board of Commissioners]."[84]   Additional evidence may supplement the

administrative record in order to resolve the dispute.[85]

> **b.     Statutory Requirements**
>
> **(1)     Effective Prohibition Clause: Blanket Prohibition or Significant Gap in Service Coverage?**

The Unified Government argues that the Act's effective prohibition clause only applies to

blanket prohibitions of personal wireless services.  T-Mobile disagrees, arguing a local entity may

violate the TCA's "effective prohibition" clause if it prevents a wireless provider from closing a

"significant gap" in service coverage.  Resolution of this argument between the parties turns on

interpretation of section 332(c)(7)(B)(i)(II) of the TCA, which restricts the authority of local zoning

boards to take any action that would "prohibit or have the effect of prohibiting the provision of

personal wireless services."  Thus, the Court must determine whether the statutory restriction applies

(a) only to blanket prohibitions affecting all wireless providers or (b) whether a local zoning board

can run afoul of the TCA's "effective prohibition" clause if it prevents a single wireless provider

---

[83]*See Sw. Bell Tel. Co. v. Apple*, 309 F.3d 713, 717 (10th Cir. 2002) (holding state commissions' interpretations of the Telecommunications Act and its regulations are reviewed *de novo*, as those decisions turn on determinations of federal law) (citations omitted); *Second Generation*, 313 F.3d at 627 (citing authority); *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d at 833) (quoting *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14, 22 (1st Cir. 2002)); *APT Pittsburgh Ltd. P'ship v. Penn Township Butler County*, 196 F.3d 469, 475 (3d Cir. 1999); *AT&T Wireless PCS, Inc. v. City Council of Va. Beach*, 155 F.3d at 431.

[84]*Nat'l Tower*, 297 F.3d at 22.

[85]*Id.*

from closing a significant gap in its own service coverage.  Notably, the circuits are split regarding whether the "prohibit or has the effect of prohibiting" language within the TCA applies to all wireless providers or a single wireless provider, and the Tenth Circuit has yet to take an authoritative position on the issue.

A city-wide general ban on wireless services would certainly constitute an impermissible prohibition of wireless services under the TCA.  In fact, this is the only circumstance under which the Fourth Circuit will find an impermissible prohibition under the statute.[86]  Under this rule, which is based on a strict plain meaning analysis, individual zoning decisions or persistent coverage gaps can never constitute a prohibition under the statute – courts must ask only whether local governments have (effectively) banned wireless services altogether.[87]

The Board of Commissioners argues the Court should adopt the Fourth Circuit's interpretation. To support its argument, the Board of Commissioners asserts the Tenth Circuit used language in the *Seminole* case that indicates the Tenth Circuit would follow the Fourth Circuit's strict interpretation of the effective prohibition clause.[88] Specifically, the Unified Government points to the following dicta: "In addition, even a cursory review of this and other circuit case law suggests

---

[86]*See  AT & T Wireless PCS, Inc. v. City Council of Va. Beach,* 155 F.3d at 429 *(*holding that only "blanket prohibitions" and "general bans or policies" affecting all wireless providers count as effective prohibition of wireless services under the TCA.)

[87]*Id.*

[88]The Tenth Circuit also has addressed effective prohibition under 42 U.S.C. § 253, which mandates that a state or local government or state or local legal requirement may not "prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications service." *See Qwest Corp. v. City of Santa Fe*, 380 F.3d 1258, 1270-73 (10th Cir. 2004) (holding that federal law preempted a city's telecommunications ordinance under 42 U.S.C. § 253 because the ordinance imposed requirements that had the effect of prohibiting companies from providing telecommunications service).

many of the . . . listed reasons for denial, even when standing alone, are sufficient to meet the substantial evidence requirement, so long as the town or city did not impose a blanket prohibition on such towers."[89]

The Court is not persuaded by the Board of Commissioners' argument. As a preliminary matter, the Tenth's Circuit's reference to "blanket prohibition" occurred in the context of conducting a substantial evidence review and not in the context of interpreting the TCA's prohibition clause. There is no evidence that the Tenth Circuit in any way considered the meaning or the scope of the TCA's prohibition clause. Thus, the Court finds there is nothing in the *Seminole* opinion to suggest that the Tenth Circuit would adopt the Fourth Circuit's position. Moreover, the Act itself does not support such a finding.[90] In fact, the Fourth Circuit's interpretation, by permitting all but the most restrictive local zoning policies, could actually thwart Congress' twin goals of encouraging competition in the wireless services industry and facilitating efficient use of bandwidth.[91]

Based on this discussion, the Court will not limit its prohibition analysis to blanket bans or general policies prohibiting wireless services.

-----

[89] *United States Cellular Corp. v. Bd. of Adjustment of the City of Seminole,* 180 Fed. Appx. at 804, 2006 WL 1288596, at *12.

[90] *See MetroPCS,* 400 F.3d at 730-31 (citing *Second Generation*, 313 F.3d at 634 ("The language of the [Act], while sparse, does not dictate such a narrow interpretation even under a plain meaning approach. As the First Circuit has observed, given the current structure of the wireless services market, '[t]he fact that some carrier provides some service to some consumers does not in itself mean that the town has not effectively prohibited services to other consumers.'")).

[91] The legislative history of the TCA describes its purpose as follows: "to provide for a pro-competitive, de-regulatory national policy framework designed to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." H.R. Conf. Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 124.

### (2)      Gap: Consumer or Individual Provider's Perspective?

Several circuits have held that, even in the absence of a "general ban" on wireless services, a city or town may violate the TCA's "effective prohibition" clause if it prevents a wireless provider from closing a "significant gap" in service coverage.[92]   "This inquiry generally involves a two-pronged analysis requiring (1) the showing of a "significant gap" in service coverage and (2) some inquiry into the feasibility of alternative facilities or site locations.

As discussed  in Section V(A)(3)(a)(2), *supra*, there currently is a split among the circuits as to whether a "significant gap" in coverage should be determined from the consumer's perspective or from the individual provider's perspective, and the Tenth Circuit has yet to rule on the issue.  As also discussed in Section V(A)(3)(a)(2), *supra*, this Court determines the approach taken by the First and Ninth Circuits is the better alternative, and thus holds that a significant gap in service (and thus an effective prohibition of service) exists when a provider is prevented from filling a significant gap in its own service coverage.  With that said, the relevant service gap must be truly "significant" and "not merely individual 'dead spots' within a greater service area."[93] Significant gap determinations are extremely fact-specific inquiries that defy any bright-line legal rule.[94]

Based on these legal standards, the Court finds T-Mobile must prove that the Unified Government has prohibited it from providing wireless services by satisfying the following two-part

---

[92]*See, e.g.*, *MetroPCS,* 400 F.3d at 715 (9th Cir. 2005); *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818 (7th Cir. 2003); *Omnipoint Commc'ns Enters., L.P. v. Zoning Hearing Bd.*, 331 F.3d 386, 399 (3d Cir. 2003); *Second Generation*, 313 F.3d at 627; *Sprint Spectrum, L.P. v. Willoth*, 176 F.3d 630, 643 (2d Cir. 1999).

[93]*MetroPCS*, 400 F.3d at 733-34.

[94]*Id.*

test. First, T-Mobile must prove that it has been prevented from filling a significant gap in its own service coverage. Second, T-Mobile must speak to the intrusiveness of the manner in which it proposes to fill the significant gap in service.  With the correct legal standards in place, the Court now turns to the evidence presented by the parties.

### 2.     Evidence

#### a.     T-Mobile's Evidence

As noted above, significant gap determinations are "extremely fact-specific inquiries that defy any bright-line legal rule."[95]  To that end, T-Mobile presents affidavits setting forth background technical information, propagation maps, drive test data, and signal strength analysis in support of its argument that a significant gap in its service coverage exists.[96] A brief review of this technical background information and a summary of this evidence follows.

Service coverage is usually evaluated in terms of signal strength.  Generally, in order to test the signal strength of a cellular network, there are two primary tools that are employed: propagation maps and drive tests. Propagation maps are relatively sophisticated computer models that predict signal strength throughout the area in question. Drive tests, by contrast, are empirical rather than predictive. They are conducted by using sensitive radio frequency scanning and global positioning system equipment which is attached to a vehicle that is driven throughout a given area in order to record actual signal strength data. The drive test data is then used to create a map illustrating actual

---

[95]*See MetroPCS*, 400 F.3d at 733.

[96]*See* December 9, 2005 Application for Special Use Permit, Exs. B(1) - B(3) to Plaintiff's Memorandum in Support of Summary Judgment (doc. 23); March 30, 2006 Propagation Studies and Coverage Report, Ex. H to Plaintiff's Memorandum in Support of Summary Judgment (doc. 23); Supplemental Affidavit of Russell Pope, Ex. M to Plaintiff's Memorandum in Support of Summary Judgment (doc. 23).

signal strength at locations throughout the area driven. Both propagation maps and drive tests are widely used throughout the wireless industry and are generally recognized as reliable and accurate.

T-Mobile first presented evidence of its gap in in-building and in-vehicle service through a radio frequency engineering report that it submitted with its Application in the Coverage Report, along with propagation maps demonstrating the existing gap in coverage and how the Proposed Site will fill the gap.  According to the Coverage Report and the propagation maps submitted, T-Mobile has three existing cell-site locations that "provide the areas near I-635 & Chelsea Traffic Way, the areas along and near I-70, and the area near the intersection of [U.S.] Hwy 24 an[d] 10th Street with good in-building coverage for a large number of residential and commercial buildings," but the existing sites "do not provide any in-building coverage to the areas along [U.S.] Hwy 24 between I-635 and 24th Street and stretching south to Kaw/Park Drive."

T-Mobile again presented the propagation maps showing its existing level of service and the level of service that can be obtained by adding the Proposed Site at the March 13 Planning Commission hearing and then re-submitted the maps with its Supplemental Coverage Report. The propagation maps show that the coverage gap related to in-building coverage is not limited to small holes in size or number, but rather the entire area "between I-70 and Wood Avenue from south to north and between Central Avenue and I-635 from east to west."[97]

In conjunction with re-submission of the propagation maps, T-Mobile also submitted results of a drive-test conducted at City Staff's request, which confirms the propagation prediction analysis

---

[97]*See Cellular Tel. Co. V. Zoning Bd. of Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 70, n.2 (3d Cir. 1999); *Willoth*, 176 F.3d at 643-44; *Nat'l Tower LLC v. Frey*, 164 F. Supp. 2d 185, 188 (D. Mass. 2001), *aff'd*, *Nat'l Tower, LLC v. Plainville Zoning Bd. of Appeals*, 297 F.3d 14 (1st Cir. 2002).

establishing a significant in-building service coverage gap.  T-Mobile's radio frequency engineer

explained the propagation maps and the drive tests at the April 10 Planning Commission hearing as

follows:

> The white areas [on the maps] are areas where you can only receive signals outdoors, you can typically not receive them in your house or place of business or even typically in your vehicle. The light green areas [on the maps] are where you typically receive the signals in your vehicle, but not inside the building. And the darker shaded green is where you receive them inside of a building.

>        *    *    *    *    *    *    *    *    *    *

> These are the drive-test results, it is the same as what you have on the board there. The blue on this drawing . . . are areas where we wanted to show you where we drove at. However, if you were to compare it to the areas on the other map it would be white. . . *So as you can see there is a lot of this area that has no in-building coverage at all*. And just because we didn't drop a call in this area while we were driving around, doesn't mean we wouldn't drop a call if you walk inside their houses over there. We don't do that during driving tests, we don't drive into houses. And our data shows that we have about 300 dropped calls in this area in a day, we have about 300 customers in this area, as well, that would like to have cell phone coverage in their houses.

In addition to the propagation maps and drive-test, T-Mobile also presented evidence of

dropped calls. This evidence certifies that in one week, customers "dropped" 1,812 calls in the

targeted area and that in another week, T-Mobile customers "dropped" over 2,700 calls in the

targeted area.  In order to quantify network quality from a dropped call point of view, T-Mobile

presented further evidence that it uses a "minutes of use per dropped call" ("MOU/drop")

measurement.  The MOU/drop measurement is a simple ratio of call traffic to dropped calls. T-

Mobile presented evidence of a MOU/drop measurement of 280 minutes for customers in the

targeted area and a MOU/drop measurement of 310 minutes for customers in the Kansas metro core.

In simple terms, the MOU/drop measurement of 280 minutes in the targeted area compared to 310

minutes in the metro core means that customers in the metro core can expect 30 more minutes of use, on average, between dropped calls than what a customer in the targeted area can expect.

Finally, T-Mobile's coverage gap consists of a sizeable area in which approximately 600 households have no in-building coverage.

### b.     The Unified Government's Evidence

In support of its claim that there is no evidence of a significant gap in service with regard to the targeted area, the Unified Government states that

- T-Mobile's customers in the Kansas metro core experience a dropped call rate of approximately 3.3% and a call completion rate of approximately 96.7%; and

- T-Mobile's customers in the area proposed to be served by the new cell tower experienced a dropped call rate of approximately 0.04% and a call completion rate of approximately 99.6%.

In its papers, T-Mobile disputes the Unified Government's calculations regarding dropped calls for two reasons. First, T-Mobile states that the Unified Government miscalculated the dropped call rate of 0.04% for the targeted area in that it divided the number of 1,812 drops by 445,000 call attempts and then erroneously multiplied the result by 10 to obtain a percentage of 0.04%. To obtain an accurate percentage, T-Mobile maintains – and the Unified Government does not dispute – that one must divide the number of dropped calls by the number of call attempts and then multiply the result by 100 (not 10). Thus, T-Mobile states the accurate rate of dropped calls for the targeted area is actually 0.41% (not 0.04%).

The Unified Government does not dispute its miscalculation but notes that, even using the correct calculations, the 0.41% dropped call rate for the targeted area is lower than the 3.3% dropped call rate for the Kansas metro core, a result which directly contradicts T-Mobile's propagation maps

65

and drive tests.  Again, T-Mobile disputes these calculations, this time on grounds that T-Mobile itself mistakenly told the Unified Government during the administrative process that, during the relevant time period, there were 53,000 dropped calls out of 1,600,000 call attempts in the area making up the Kansas metro core.  In a sworn affidavit filed by T-Mobile's Director of Engineering and Operations in conjunction with the pending motion, T-Mobile states that the actual number of call attempts during that time period for the Kansas metro core was 16,000,000, not 1,600,000.[98]  As a result, T-Mobile maintains the correct rate of dropped calls for the Kansas metro core is actually 0.33% (not 3.3%).  T-Mobile thus concludes that the 0.41% dropped call rate for the targeted area is 24% higher than the 0.33% rate of dropped calls in Kansas metro core, a conclusion which supports the propagation maps and drive-tests T-Mobile previously submitted.

### 3.    Analysis

#### a.    Significant Gap

As a preliminary matter, the Court finds it necessary to consider the level of coverage (outdoor, in-vehicle, or in-building) that should be taken into account when determining whether a significant gap exists. More specifically, and given the particular facts presented in this case, the Court must decide whether a lack of in-building coverage is sufficient to constitute a "significant gap" for purposes of T-Mobile's effective prohibition claim.

There is a lack of controlling authority on this question, and a review of the available

---

[98]The parties agree that the Court may consider the corrected number of 16,000,000 call attempts for its review under the prohibition clause, 47 U.S.C. § 332(c)(7)(B)(i)(II).  Unlike a substantial evidence claim, the parties agree that an effective prohibition claim may be based on newly proffered evidence and is reviewed *de novo*. *See Second Generation,* 313 F.3d at 629 (citing authority). The anti-prohibition clause "present[s] questions that a federal district court determines in the first instance without any deference to the [Board of Commissioner]." *Nat'l Tower*, 297 F.3d at 22.  Additional evidence may supplement the record in order to resolve the dispute. *Id.*

persuasive authority reflects that the question has been decisively determined in only one case: *MetroPCS Inc. v. City and County of San Francisco*.[99] Relying on a careful reading of existing cases that contain a significant gap analysis, the *MetroPCS, Inc.* court held that a significant gap analysis should include consideration of a wireless carrier's in-building coverage.[100] Citing the *Sprint Spectrum v. Willoth* case, the court "embraced the notion that in-building coverage should be included in any significant gap analysis by stating that de minimis coverage holes are those that are limited in number and size, such as 'the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the area covered by buildings increases.'"[101] The *MetroPCS* court concluded that where coverage holes are large or frequent in number and size, and extend to the interior of buildings in urban areas or to a significant number of residences in well-populated areas, such coverage holes are actionable under the TCA.[102] The Court is persuaded by the reasoning set forth in the *MetroPCS* case and finds that in-building coverage may

---

[99]No. C 02-3442 PJH, 2006 WL 1699580, *10-11 (N.D. Cal. June 16, 2006).

[100]*Id.* (citing *Sprint Spectrum v. Willoth*, 176 F.3d at 643 (measuring significant gap with regard to both in-vehicle and in-building coverage)); *U.S.C.O.C. of N.H. v. Town of Dunbarton*, No. Civ. 04-CV-304-JD, 2005 WL 906354 (D.N.H. April 20, 2005) (holding that in-building coverage is relevant for purposes of evaluating a significant gap under the TCA); *see also Am. Cellular Network Co., LLC v. Upper Dublin Twp.*, 203 F. Supp. 2d 383, 391 (E.D. Pa. 2002)(evaluating evidence of significant gap that included propagation maps illustrating in-building coverage).

[101]*Id.* (citing *Sprint Spectrum v. Willoth*, 176 F.3d at 643).

[102]*Id.* (citing *Nextel Partners, Inc. v. Town of Amherst*, 251 F. Supp. 2d 1187, 1196 (W.D.N.Y. 2003) (finding effective prohibition under the TCA and noting that evidence showed that significant gap was "clearly substantial and not limited to rural areas or the interior of buildings in sparsely populated areas"); *Am. Cellular*, 203 F. Supp. 2d at 389 (finding that significant gap existed and stating that scope of any significant gap is dependent on "how many users are affected by the gap, or how large an area is in the gap").

appropriately be considered as part of the significant gap analysis.

Having decided that in-building coverage may appropriately be considered as part of the significant gap analysis, the question to be answered by the Court is whether, in this case, T-Mobile has in fact demonstrated the existence of a significant gap with respect to (1) outdoor; (2) in-vehicle; or (3) in-building coverage. On balance, the Court finds that the propagation maps, drive test results, and/or call test results introduced by both parties support the existence of a significant gap in the area along U.S. Highway 24 between I-635 and 24th Street and stretching south to Kaw/Park Drive throughout which no reliable in-building coverage is present. Accordingly, the Court finds that T-Mobile has proven that there is, in fact, a widespread gap in its in-building coverage in the area proposed to be served by the new cell tower.

Since T-Mobile has proven a significant gap with respect to in-building coverage, it is unnecessary for the Court to examine whether T-Mobile also has sufficiently proven a gap in either in-vehicle or outdoor coverage. In short, the whole of the evidence supports T-Mobile's assertion that its in-building coverage is unreliable, inconsistent and insufficient to support its provision of services throughout the area along Highway 24 between I-635 and 24th Street and stretching south to Kaw/Park Drive.

In so holding, the Court is mindful that the TCA does not guarantee T-Mobile seamless coverage in every location within the targeted area. Indeed, courts have expressly recognized that the presence of "dead zones," or pockets in which coverage does not exist, are not actionable for

purposes of arguing effective prohibition claims under the TCA.[103] Here, however, T-Mobile has proven that its lack of in-building coverage within the area to be served by the new tower is widespread, and qualifies as more than mere "dead spots." Given the Court's finding that T-Mobile has been prevented from filling a significant gap in its own service coverage, the Court now turns to the second prong of the test: the intrusiveness of the manner in which T-Mobile proposes to fill the significant gap in service.

### b. Intrusiveness of Proposed Site

#### (1) The Appropriate Standard to Determine Intrusiveness

As set forth in Section V(A)(3)(b)(1), *supra*, the Court has adopted the "least intrusive on values the denial sought to serve" standard. Given adoption of this standard, the Court now must determine whether the proposed tower qualifies as the least intrusive means of fulfilling the gap in service based on the values the Board of Commissioners' denial sought to serve.

#### (2) Application of the Least Intrusive Means Standard

T-Mobile asserts it made a good faith effort to identify and evaluate less intrusive alternatives to the Proposed Site. More specifically, T-Mobile cites to the record showing that (a) it surveyed existing WCFs to see whether a co-location would close the service gap, but found none in the area; (b) it reviewed site alternatives within the service gap and selected a site that was zoned for the greater density and selected one of the few non-residential properties within the area; (c) it volunteered to provide a 50-foot tree buffer around the WCF; and (d) it designed the proposed WCF

---

[103] *See MetroPCS*, 400 F.3d at 733 ("'the TCA does not guarantee wireless service providers coverage free of small 'dead spots'"); *see also 360 Degrees Commc'ns Co. of Charlottesville v. Bd. of Supervisors of Albemarle County*, 211 F.3d 79, 87 (4th Cir. 2000) (same); *Second Generation*, 313 F.3d at 631 (same).

to conform to the Unified Government's height, color, setback, access, and security requirements under the Code.

Conversely, the Unified Government identifies three reasons why the Proposed Tower is not the least intrusive means of filling T-Mobile's coverage gap. For its first and second reasons, the Unified Government argues that the Code states a preference for placement of telecommunications towers in commercial districts over residential districts and the property's current zoning as R-1(B) Single Family. The Court rejects the Unified Government's argument.. Considering that the property is designated commercial on the Master Plan, is surrounded by predominantly commercial or non-residential uses, has only a "few" residences in the area, and is currently not used as residential property, the Court finds that the Proposed Tower is not intrusive on the Code's stated preferences.

The Unified Government's third reason for finding that the Proposed Tower is not the least intrusive means of filling T-Mobile's coverage gap is that: "[t]he immediate neighborhood includes mixed residential, institutional and commercial uses typical of the land adjacent to Minnesota and State Avenue between 18th Street and 36th Street. The areas to the north and south of the Avenues are primarily residential. A 120-foot tower is not aesthetically attractive in a residential neighborhood and would create blight in the view of the surrounding residential properties. This tower will be the tallest structure in the area and highly visible from all directions."

Setting aside the fact that the Board of Commissioners' finding on the aesthetic impact of the tower is not supported by substantial evidence, the Court finds that the Proposed Tower is designed to be aesthetically non-intrusive. It is a stealth monopole designed to look like a flagpole. It will not have antennas or any other protrusion from the tower. T-Mobile reduced the height of the tower by thirty feet to accommodate the Unified Government's concerns regarding the height. The

70

Church structure will block a significant portion of the monopole.  The Proposed Tower complies with all tower specifications in the Code.  No one in the area surrounding the Proposed Tower voiced any opposition to its construction.  Simply put, the Court finds that the Proposed Tower is the least intrusive means according to the values the Written Denial seeks to serve.

Moreover, the evidence submitted demonstrates that T-Mobile considered all potential co-location sites within the site justification map, but found no site that was both available and technologically feasible (i.e., within the radio frequency search ring) to remedy the coverage gap. Specifically, T-Mobile submitted the Affidavit of Robert M. Herlihy, an employee of Selective Site Consultants, stating that T-Mobile requires site acquisition personnel to first look for co-location opportunities within a given search area before attempting to find areas where a new tower will be required.  Mr. Herlihy stated in the affidavit that to fulfill this requirement, he drove the area within a one-mile radius of the Proposed Site "to determine if there were any available structures that would meet the Radio Frequency Engineer's requested antenna height."

In addition, the Application Letter explained: "When new tower sites are required, a location is chosen after a 'Search Ring' is developed and issued by T-Mobile's Radio Frequency Engineers. The Search Ring indicates a geographic area in which potential sites may be located [that] will result in the maximum amount of coverage in an impaired service area." Herlihy states he looked for structures such as water towers, existing telecommunication towers, and tall buildings that would provide co-location opportunities at the height limitation provided by T-Mobile's Radio Frequency Engineers. Herlihy found a few water towers to the west of the Proposed Site, but the towers "appear to be full of antennas at the present time and are located too far to the west to be of value in covering the coverage objective of the area in and around the intersection of US Highway 24 and 29th Street."

71

Herlihy also explained:

> There is a stadium light standard monopole on the grounds of Wyandotte High
> School approximately .50 miles to the southeast of the [P]roposed [S]ite. While this
> tower appears to be approximately the desired height requested by T-Mobile's Radio
> Frequency Engineer of 130 feet, there is presently a carrier occupying the top of the
> tower. Because of vertical separation requirements between antennas of 20 feet, the
> highest T- Mobile could go on this structure is 110 feet. When you couple this with
> the fact that the High School tower sites at an elevation seventy feet (70') lower than
> that at the [P]roposed [S]ite, the effect is to make this tower ineffective (see
> differences in coverage patterns shown by propagation comparisons included in this
> packet).

According to the Coverage Report and accompanying Propagation Prediction Study titled

"Proposed T-Mobile coverage using the existing monopole at Wyandotte High School," T-Mobile's

coverage gap will not be filled if T-Mobile uses the High School Tower.  At the March 13 Planning

Commission hearing, Vice-Chairman Davis asked if there is another site that T-Mobile could

co-locate on, and T-Mobile's representative, Herlihy, explained that "[T-Mobile] looked at the high

school to the southeast and they did a propagation study and there were deficiencies that they could

not [co-]locate on the light standard. [T-Mobile] looked at a couple of water towers to the west and

they seemed to have antenna on the top of them and it would indicate that they would be lower on

the tower."

Davis also asked Herlihy if T-Mobile talked to BPU to find out if there was space available

and then performed the propagation study, and Herlihy explained that T-Mobile has "dealt with BPU

and when a site is available that meets their search area criteria or is close enough to be used for what

they are trying to cover they do use that. But in this case, that was not acceptable; it was too far out

of the search ring in order to be an acceptable site."

At the May 25 Board of Commissioners meeting, T-Mobile addressed the possibility of

co-location at the High School Tower and, using radio frequency propagation maps, explained: "

72

We did analyze this site at Wyandotte High School. That's a Cingular site, but again it's too far outside the [search ring]. The elevation difference between Wyandotte High School and our site here at First Baptist is 40 [feet]. There is a 40 [foot] drop in elevation, which makes a significant difference in terms of what we can cover.

Based on the evidence presented, the Court finds that T-Mobile conducted a comparison of alternative sites that was truly meaningful and identified the best solution for the community. Thus, the Court concludes that T-Mobile sufficiently has established the First Baptist Church site truly is the least intrusive means of filling its significant gap. Accordingly, T-Mobile has adequately demonstrated that the Unified Government's denial of its Special Use Permit prohibited or effectively prohibited it from providing wireless services in violation of 47 U.S.C. §§ 332(c)(7)(B)(i)(II).

## VI.     <u>CONCLUSION</u>

The Court concludes that the Unified Government's denial of T-Mobile's application for a Special Use Permit to construct a wireless telecommunications facility violates the TCA because the denial was not supported by substantial evidence and has the effect of prohibiting the provision of personal wireless services in violation of the TCA.

Accordingly, the Court grants T-Mobile's Motion for Summary Judgment (doc. 22) and denies the Unified Government's Motion for Summary Judgment (doc. 28).   T-Mobile's counsel is directed to meet and confer with counsel for the Unified Government and submit a proposed final order granting the relief requested in Plaintiff's Complaint by no later than October 15, 2007.

IT IS SO ORDERED.

Dated in Kansas City, Kansas on this 28th day of September, 2007.

s/ David J. Waxse
David J. Waxse
United States Magistrate Judge

cc:    All counsel and *pro se* parties